Robert W. **HEIDGERD,**
Plaintiff–Appellee,

v.

**OLIN CORPORATION,**
Defendant–Appellant.

No. 833, Docket 89–7869.

United States Court of Appeals,
Second Circuit.

Argued Feb. 26, 1990.

Decided June 26, 1990.

William J. Doyle, New Haven, Conn. (James J. Nixon, Wiggin & Dana, New Haven, Conn., on the brief), for defendant-appellant.

David S. Golub, Stamford, Conn. (Tanina Rostain, Catherine C. Ziehl, Stamford, Conn., Donald F. Zezima, Macrides, Zezima & Christiano, Stamford, Conn., on the brief), for plaintiff-appellee.

Before OAKES, Chief Judge, and KEARSE, Circuit Judge.[*]

KEARSE, Circuit Judge:

Defendant Olin Corporation ("Olin") appeals from a final judgment of the United States District Court for the District of Connecticut, entered pursuant to Fed.R. Civ.P. 54(b) after a bifurcated bench trial before T.F. Gilroy Daly, Judge, awarding Robert W. Heidgerd, one of more than 170 plaintiffs in this case, $9,350.88, plus interest, in severance benefits and an increase in his pension benefits. The district court found that Olin's refusal to pay Heidgerd severance and other benefits upon the sale of the Olin division by which he was employed violated his rights under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* (1988). On appeal, Olin contends principally (1) that its denial of benefits was proper as a matter of law, and (2) that even if the denial was improper, Heidgerd should have been awarded a lesser amount in damages, not full severance pay or other benefits. Finding no merit in Olin's contentions, we affirm the judgment of the district court.

## I. BACKGROUND

The facts, as set forth in the largely unchallenged findings of the district court or as otherwise reflected in the record, are as follows. In early 1980, Olin decided to sell or liquidate its Winchester Arms Divi-

---

[*] Circuit Judge John M. Walker, Jr., originally a member of the panel, disqualified himself after oral argument.

sion ("Winchester"). Because Winchester's manufacturing technology was antiquated, Olin determined that it would be more profitable to sell the division as a going concern; Olin thought it crucial to such a sale to persuade Winchester employees familiar with the production process to accept jobs with the purchaser. In December 1980, Olin announced its plans to its employees.

After the announcement, Heidgerd consulted a booklet distributed in 1978 to all Olin employees, entitled "**Olin** The Severance Pay Plan" (the "Booklet"), to determine what his severance benefits would be in the event the sale of Winchester resulted in the loss of his job with Olin. The Booklet summarized Olin's severance policy, including, *inter alia,* the circumstances under which employees would or would not be entitled to receive severance pay. Most pertinently, it stated:

> **Benefits aren't payable** if you resign to take another job, to become self-employed, or because you're dissatisfied with some reasonable condition of employment.
>
> If your Olin operating unit is sold to another company and the new owner offers you employment at substantially the same rate of pay, you won't be eligible for severance payments if you decide to leave instead.

In discussing benefits other than severance pay, the Booklet stated, in pertinent part,

> While you're receiving severance payments during the normal severance period, you'll continue to earn benefit service credits under the pension plan. When severance payments stop, service accrual under the pension plan stops too.
>
> . . . .
>
> You may continue making contributions to the thrift plan, which Olin will match, while you're receiving scheduled severance pay benefits. After that, your contributions and the company's stop.

Though the Booklet was the document distributed to the employees, it was not Olin's "official" severance pay policy (the "Plan"), but merely purported to summarize that policy. The Plan itself contained slightly different terms. It stated, in pertinent part:

> Severance payments will be stopped under the following conditions:
>
> . . . .
>
> —Employee commences employment with a new company. Any unpaid severance will be paid in a lump sum, and benefits coverage will be discontinued.

**Treatment of Employee Benefits**

Pension Plan—

> Employees will receive benefit service credit for purposes of computing benefits under the Pension Plan for the period of time for which benefits are paid to them under this policy.

Thrift Plan—

> Employees may continue to have contributions to the Thrift Plan withheld from severance payments for the period of time for which benefits are paid to them under this policy.

Unlike the Booklet, the Plan itself was neither filed with the United States Secretary of Labor, as required by ERISA, 29 U.S.C. § 1021(b)(2), nor distributed to the employees.

Heidgerd interpreted the Booklet as providing that he would fail to receive benefits only if (a) he were terminated for just cause or (b) the purchaser offered him a job at substantially the same rate of compensation and he failed to accept it. Because he was not certain that this interpretation was correct, however, he consulted his own supervisor and his supervisor's supervisor. Notwithstanding the conflicting language of the Plan, both of these supervisors confirmed that, under the terms of the Booklet, Heidgerd would receive severance benefits unless he rejected a job with the purchaser.

In the meantime, Olin realized that, in order to facilitate the sale of Winchester as a going concern, it needed to persuade employees to stay with the division at least through the period of negotiations. Accordingly, it instituted what it termed a "special severance policy." Under this special policy, salaried employees such as Heidgerd were to be offered severance ben-

efits at a rate higher than the normal benefits if they remained with the Company at least through the period of uncertainty, and they would be entitled to receive those benefits even if they eventually rejected an offer with the eventual purchaser. In addition, any employee who accepted an offer with the purchaser but was terminated within 180 days of starting employment remained eligible for those augmented severance benefits. This special severance was intended to replace the company's normal severance policy; however, the terms were not made generally available but were to be communicated orally only to selected employees as an incentive to encourage them to stay on. These special terms were not communicated to Heidgerd.

In July 1981, Olin announced that Winchester would be sold to U.S. Repeating Arms Company ("USRAC"). Heidgerd and the other plaintiffs accepted offers of employment from USRAC. As a result, when the sale was completed on July 20, 1981, their employment with Olin ceased and they became employees of USRAC.

Shortly after plaintiffs accepted the USRAC offers, Olin announced that it would not pay benefits to employees who had accepted jobs at USRAC. Olin interpreted its severance policy, as expressed in both the Plan and the Booklet, to mean that if an employee received an offer from USRAC, he was not entitled to severance benefits, whether or not he accepted the offer. Olin adopted this interpretation despite the advice of the Winchester Personnel Director that the Booklet told employees they were entitled to severance if they accepted jobs with USRAC.

Thereafter Heidgerd and approximately 171 other former Olin employees, contending that the terms of the Booklet entitled them to severance benefits because they had not rejected USRAC's offers, commenced the present suit in Connecticut Superior Court, from which it was eventually removed to the district court. As amended, the complaint alleged that Olin's failure to pay severance benefits in accordance with the Booklet constituted breach of contract and unfair trade practice under Connecticut law; plaintiffs also asserted that if their state law claims were preempted under ERISA, Olin's denial of severance benefits violated ERISA.

The district court ordered that the trial be bifurcated. Following trial of the liability issues, at which only four of the plaintiffs testified, the district court held that plaintiffs had established that Olin was potentially liable, though its actual liability with respect to each individual plaintiff would have to be determined on a case by case basis.

In a Memorandum of Decision dated September 22, 1988 ("September 22 Decision"), the court ruled that the Booklet was a "plan summary" within the meaning of ERISA, 29 U.S.C. § 1022, and that ERISA thus governed review of the denial of benefits. The court found that there was a conflict between the terms of the Booklet and those of the Plan and ruled that the language of the Booklet controlled.

As to the standard for reviewing a plan administrator's denial of benefits, the court, relying on *Bruch v. Firestone Tire and Rubber Co.*, 828 F.2d 134, 143–45 (3d Cir.1987), *aff'd in part and rev'd in part*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), stated that, because Olin administered its own plan, rather than using an independent trustee, the appropriate standard was *de novo* review, rather than the arbitrary-and-capricious standard generally applied in this Circuit, *see e.g., Accardi v. Control Data Corp.*, 836 F.2d 126 (2d Cir. 1987); *Schwartz v. Newsweek*, 827 F.2d 879 (2d Cir.1987). However, it concluded that Olin's decision could not survive scrutiny under either standard. Using the *de novo* standard, the court refused to defer to Olin's interpretation of the Booklet, choosing instead to enforce the most reasonable interpretation of the language. The court found that plaintiffs' reading of the pertinent provision was reasonable and should be adopted. Further, the court found that "[t]he plan administrator's admitted failure to even consider whether plaintiffs reasonably relied to their detriment on the plan summary booklet's admittedly ambiguous and indeed misleading language was not a

reasonable resolution of the controversy and thus was arbitrary and capricious." September 22 Decision at 14. Accordingly, the court concluded that Olin had violated the terms of its severance policy as expressed in the Booklet.

Nonetheless, the court ruled that each plaintiff, in order to recover, would have to show that he relied on the language of the Booklet, giving him a reasonable expectation that he would receive severance benefits after accepting a job with USRAC. Though reliance findings as to most of the plaintiffs were to await further proceedings, the court was able to make such findings immediately with respect to the four plaintiffs who testified during the liability phase; it found that Heidgerd had relied and that the other three had not.

The court determined that Heidgerd had read the Booklet and "did in fact expect to receive severance benefits under it upon accepting an offer with USRAC.... Furthermore, prior to accepting USRAC's offer, Mr. Heidgerd was not informed by anyone that severance would not be payable under the plan summary booklet if he accepted an offer with USRAC." *Id.* at 18. The court thus found that Heidgerd was entitled to recover.

As to the amount he was entitled to recover, the court found, in a Memorandum of Decision dated May 25, 1989, that since Heidgerd was entitled to the full duration of severance payments, he was also entitled to pension and thrift benefits during the entire severance pay period. This amounted to $9,344.00 in severance payments and $186.88 in thrift contributions; the court ordered Olin to adjust his pension credit to reflect the full amount of time he had worked for Olin plus the period during which he was entitled to severance pay.

The court entered judgment in favor of Heidgerd granting the above relief, and it certified the judgment as final, pursuant to Fed.R.Civ.P. 54(b), in order to permit an immediate appeal on the liability issues. This appeal by Olin followed. A cross-appeal by Heidgerd has been withdrawn.

## II.  DISCUSSION

On appeal, Olin contends (1) that the district court erred in finding that Olin violated the terms of its severance policy; (2) that even if the terms of the policy were violated, Heidgerd was not entitled to full severance payments but only to damages sufficient to compensate for any harm actually suffered as a result of his reliance on the Booklet; and (3) that Heidgerd was not entitled to augmented pension and thrift benefits in addition to the severance payments. We have considered all of Olin's arguments on appeal and find them to be without merit.

### A.  *Liability*

■  To start with, we note that, for two reasons, the district court properly concluded that the terms of the Booklet were controlling, notwithstanding Olin's reliance on the different terms of the Plan. First, ERISA requires employers to file copies of their actual benefit plans, as well as their summary plans, with the Secretary of Labor. 29 U.S.C. § 1021(b). Although Olin did file the Booklet, it concedes that at no time did it file the Plan. Olin cannot now rely on language in a document that did not comply with ERISA to contradict the Booklet, which was filed.

Second, only the Booklet, not the Plan itself, was distributed to employees. The Booklet purported to summarize the Plan. ERISA and the regulations promulgated under it require that employees be given such summaries. *See* 29 U.S.C. § 1022 (1988) (company must furnish its employees with summary forms of benefit plans describing, *inter alia*, "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits"); 29 C.F.R. § 2520.102–2(a) (1989) (summary description "shall be sufficiently comprehensive to apprise the plan's participants and beneficiaries of their rights and obligations under the plan"). Thus, the statute contemplates that the summary will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary. To allow the Plan

to contain different terms that supersede the terms of the Booklet would defeat the purpose of providing the employees with summaries.

> It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complicated document, and then proclaim that any inconsistencies will be governed by the plan. Unfairness will flow to the employee for reasonably relying on the summary booklet.

*McKnight v. Southern Life and Health Ins. Co.*, 758 F.2d 1566 (11th Cir.1985). We conclude that the district court properly held that where, as here, the terms of a plan and those of a plan summary conflict, it is the plan summary that controls.

■ We also conclude that the district court properly considered the denial of severance benefits in this case under a *de novo* standard of review. At the time the district court issued its decision in the liability portion of this case, there was not total uniformity as to the standard of review of an ERISA plan administrator's denial of benefits. Most circuits required a determination of whether the denial was arbitrary and capricious. *See, e.g., Miles v. New York State Teamsters Conference*, 698 F.2d 593, 599 (2d Cir.), *cert. denied*, 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983); *Dennard v. Richards Group, Inc.*, 681 F.2d 306, 314 (5th Cir.1982); *Varhola v. Doe*, 820 F.2d 809, 813 (6th Cir.1987); *Pabst Brewing Co. v. Anger*, 784 F.2d 338, 338 (8th Cir.1986); *Dockray v. Phelps Dodge Corp.*, 801 F.2d 1149, 1152 (9th Cir. 1986); *Anderson v. Ciba–Geigy Corp.*, 759 F.2d 1518, 1522 (11th Cir.), *cert. denied*, 474 U.S. 995, 106 S.Ct. 410, 88 L.Ed.2d 360 (1985). In contrast, the Third Circuit required a *de novo* review where the impartiality of the plan administrator was called into question, as when the employer itself administered the plan. *See Bruch v. Firestone Tire and Rubber Co.*, 828 F.2d at 143–45. The Supreme Court has now clarified the standard of judicial review for benefit determinations by fiduciaries or plan administrators under ERISA.

In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (*"Bruch"*), *aff'g in part and rev'g in part Bruch v. Firestone Tire and Rubber Co.*, 828 F.2d 134 (3d Cir.1987), the Court, looking to principles of trust law, established a single standard to be applied irrespective of whether the plan administrator was operating under a possible or actual conflict of interest. The Court ruled that in all cases "a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* 109 S.Ct. at 956. The judgment of the district court is not inconsistent with *Bruch*.

Although Olin argues that the arbitrary-and-capricious standard of review was proper in light of *Bruch* because its plan administrator had discretion to determine benefits, we see no grant of discretion insofar as most circumstances were concerned, including the present circumstances. For example, the Booklet stated:

> You *will* receive severance pay if you're dismissed from Olin for any reason other than 'cause.' ...
>
> ....
>
> .... Benefits *are* payable if you must resign because of ill health.
>
> ....
>
> **Benefits *aren't* payable** if you resign to take another job, to become self-employed, or because you're dissatisfied with some reasonable condition of employment.
>
> If your Olin operating unit is sold to another company and the new owner offers you employment at substantially the same rate of pay, you *won't* be eligible for severance payments if you decide to leave instead.

(Emphasis added.) The categorical language illustrated above with respect to circumstances that were outlined with specificity contrasted with the language used for circumstances that were unspecified. For the latter, the Booklet stated:

In some unusual cases, benefits *may* be payable under other circumstances than those outlined on this page. Exceptions must be approved by the appropriate industrial relations manager and the corporate director of personnel.

(Emphasis added.)

We conclude that the language used in the Booklet leaves no room for any supposition that, in the circumstances of this case, the plan administrator had discretion as to whether or not severance benefits would be awarded. Thus, under *Bruch*, Olin's denial of severance benefits to plaintiffs was to be reviewed *de novo*.

The district court concluded that the denial of benefits was improper whether reviewed under either an arbitrary-and-capricious or a *de novo* standard. Since the court conducted its own analysis of the relevant provisions of the Booklet, its review was not inconsistent with the standard required by *Bruch*.

■ Finally, we find no error in the district court's analysis of the terms of the Booklet. The most pertinent provision stated:

If your Olin operating unit is sold to another company and the new owner offers you employment at substantially the same rate of pay, you won't be eligible for severance payments if you decide to leave instead.

Given the final clause of that sentence— "you won't be eligible for severance payments *if you decide to leave instead*" (emphasis added)—the district court did not err in finding reasonable the plaintiffs' interpretation of the Booklet as stating that they would be eligible for such benefits if they decided to accept USRAC jobs. We conclude that the district court properly ruled that Olin was liable to Heidgerd for failure to pay him severance benefits.

B. *The Damages Issues*

Olin makes two challenges to the district court's calculation of damages, which we also find to be without merit.

1. *The Proper Amount of Severance Benefits*

Olin contends that in calculating the amount of severance benefits to which Heidgerd was entitled, the district court used the wrong measure of damages. It characterizes the court's decision as holding

not that plaintiffs are entitled to severance from Olin pursuant to Olin's Severance Pay Plan but rather that Olin may be liable to plaintiffs despite the terms of the Severance Plan because Olin may have misled plaintiffs into deciding to accept USRAC's offer under the mistaken belief that by doing so they would receive Olin severance,

and argues that any damages awarded, therefore, should not have been the amount of severance pay specified in Olin's Booklet but only an amount reflecting the detriment each plaintiff can show he suffered due to his reliance on his mistaken belief. Thus, it would have the court deduct from the specified amount any salary or other payments a plaintiff received from USRAC. We reject this suggestion.

Olin's description badly misconstrues the district court's decision. While the court did hold that in order to recover, a plaintiff must show reliance, it did not purport to treat the claim as a fraud or other common-law tort claim; rather, it held merely that each plaintiff must show reliance on the terms of the Booklet in order to recover for the violation of his ERISA rights.

We note in passing that the issue of whether the imposition of this reliance requirement was proper is not before us on this appeal. No final judgment was entered against the three plaintiffs as to whom the district court found no reliance, and although Heidgerd appears to argue in his brief to this Court that proof of reliance should not have been required, he has no standing to advance that contention since the court found that he had in fact demonstrated reliance. Thus, we express no view as to the correctness of the ruling that proof of reliance is necessary to the enforcement of the terms of an ERISA plan summary.

■ Finally, we think it clear that the district court was correct in finding that Heidgerd was entitled to the full amount of severance pay set out in the Booklet for an employee of his age and tenure. The Booklet did not in any way suggest that the amount of severance to which an employee was entitled would be diminished by his accepting employment with a purchaser of the division. The court properly declined to make deductions from the severance amounts specified in the Booklet.

### 2. The Award of Other Benefits

■ Olin also contends that even if Heidgerd was entitled to severance pay, he was not entitled to have his pension and thrift benefits augmented. In light of the express provisions of the Booklet, we reject this contention as well.

The Booklet provided for periodic severance payments, the duration of which was to vary with the employee's age and the length of his service with Olin; it did not suggest that those payments would be eliminated, curtailed, or advanced in the event the employee accepted a job with another employer. As to the continuation of other benefits, the Booklet provided as follows:

> While you're receiving severance payments during the normal severance period, you'll continue to earn benefit service credits under the pension plan. When severance payments stop, service accrual under the pension plan stops, too.
>
> . . . .
>
> You may continue making contributions to the thrift plan, which Olin will match, while you're receiving scheduled severance pay benefits.

Olin's reliance on the Plan, which provided that if an "[e]mployee commences employment with a new company[, a]ny unpaid severance will be paid in a lump sum, and benefits coverage will be discontinued," is misplaced. As indicated above, where, as here, the Plan and the Booklet are in conflict, it is the Booklet that controls. Given the terms of the Booklet, the district court correctly held that Heidgerd was entitled to pension and thrift benefits for the entire period during which he was entitled to severance payments.

### CONCLUSION

We have considered all of Olin's arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.