**Nicholas POCCHIA and Edwin Molina, Plaintiffs,**

**v.**

**PRUDENTIAL INSURANCE COMPANY; Daily News, L.P.; and Daily News, L.P. Benefits Program, Defendants.**

**Raymond Feifer, Plaintiff,**

**v.**

**Prudential Insurance Company; Daily News, L.P.; and Daily News, L.P. Benefits Program, Defendants.**

**Nos. 96 CV 5607(ILG), 98 CV 961(ILG).**

United States District Court, E.D. New York.

Nov. 5, 1999.

Myron D. Rumeld, Proskauer Rose LLP, New York City, Edward D. Greenberg, Schwartz & Greenberg, New York City, Jeffrey L. Kreisberg, Kreisberg, Maitland & Thornhill, LLP, New York City.

## MEMORANDUM and ORDER

GLASSER, District Judge.

Plaintiffs in these consolidated actions are former full-time employees of defendant Daily News, L.P. ("DNLP"), who, since 1994, have been receiving benefits under a long-term disability plan (the "LTD Plan," or the "Plan"), which is one of the benefits made available to employees under the Daily News, L.P. Benefits Program (the "DNLP Benefits Program," or the "Program"), also a defendant in this case. Benefits under the LTD Plan are provided and underwritten by defendant insurer, Prudential Insurance Company ("Prudential"). Plaintiffs allege that their rights under the LTD Plan and under controlling provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 et seq., were violated when defendants reduced, or sought to reduce, their Plan benefits by the amount they were receiv-

ing in disability benefits from other sources, including Workers' Compensation and Social Security. Defendants allege in response that those reductions in benefits are binding on the plaintiffs, pursuant to offset provisions specifically set forth in the terms of the contract between DNLP and Prudential under which the Plan was made available to plaintiffs, and under settled principles of ERISA jurisprudence. Accordingly, the defendants have interposed counterclaims against plaintiffs Pocchia and Molina seeking return of excess payments made before offset amounts had been calculated.[1]

Plaintiffs here seek summary judgment on their claims, and dismissal of defendants' counterclaims. Defendants move in turn for summary judgment dismissing plaintiffs' claims, and granting their counterclaims. Prudential also seeks a judgment, pursuant to 28 U.S.C. § 2201, declaring that its reductions of plaintiffs' benefits pursuant to the Plans offset provisions have been proper, and an award of costs, and attorneys' fees pursuant to 29 U.S.C. § 1132(g). For the reasons that follow defendants' motions for summary judgment dismissing plaintiffs' claims and granting their counterclaims are granted in their entirety; plaintiffs' motion for summary judgment is denied, and their action is dismissed; Prudential's action for a declaratory judgment is granted to the extent that the judgment they seek is set forth in this memorandum and order; and Prudential's motion for an award of costs and attorneys' fees is denied.

# FACTS

## A. The DNLP Benefits Program

Plaintiffs were all longtime employees of DNLP and its predecessors, who left full-time employment at different times in 1994 and were subsequently awarded disability benefits. Plaintiffs were non-union, supervisory employees, and as such, their benefits were administered under the DNLP Benefits Program. The Program's benefits package includes medical and dental insurance, life insurance, a 401(k) program, and both short-term and long-term disability plans.

In 1991, following a strike by delivery drivers against the Daily News, the paper was acquired by Robert Maxwell. By 1993, Maxwell had run the Daily News into bankruptcy, and it was acquired by its current publisher, DNLP. The DNLP Benefits Program was established at that time, under new insurance contracts with Prudential, to replace the benefits program that had existed during the years of Maxwell's proprietorship. (DNLP's Rule 56.1 Statement at ¶¶ 3–5; Prudential's Rule 56.1 Statement, Exh. I.) Part of DNLP's motivation in contracting for a new employee benefits regime was to cut costs. Thus, under the new Plan, long-term disability benefits were capped at 60 percent of income. Under the previous long-term disability plan, that figure had been 66⅔ percent. (Id. at ¶ 7.)[2]

Prudential began insuring eligible DNLP employees, and DNLP began pay-

1. No counterclaim was filed against plaintiff Feifer, because Feifer had already reimbursed the alleged offset amounts to the Plan.

2. DNLP calls particular attention to a provision of the sales agreement under which the Daily News was sold to DNLP, stating that "[f]ollowing the Closing, Buyer will implement new welfare and benefits plans for nonbargaining unit employees hired by Buyer substantially comparable to those of U.S. News." (Peck Aff. ¶ 5.) U.S. News was owned at the time by Mortimer Zuckerman, who was also, at the time, one of the two principals of DNLP. (Id. at ¶ 2.) In the course of negotia-

tions between DNLP and Prudential, Prudential was advised that coverage under the DNLP Benefits Plan should be comparable to that provided under the U.S. News plans. (Prudential's Rule 56.1 Statement at ¶¶ 6–7.) Under the U.S. News long-term benefits plan, disability earnings are capped at 60% of pre-disability salary, and offsets do apply for compensation received from sources including, but not limited to, Workers' Compensation and Social Security. (Peck Aff., Exh. B; Prudential's Rule 56.1 Statement at ¶ 7; Rado Aff. at ¶ 6.)

ing premiums in consideration of that coverage, on January 8, 1993. (Rado Aff. at ¶ 7.) In September, 1993, Prudential presented DNLP with a draft "Benefit Booklet" for "Contract No. GW–22581," setting forth a detailed summary of the terms governing coverage under all of the insurance and benefits plans comprising the DNLP Benefits Program. (Prudential's Rule 56.1 Statement, Exh. I.) The draft Benefit Booklet contains a description of the "Offset Amount" applicable to awards of long-term disability benefits under the Plan, which makes clear that such awards will be reduced by amounts received under workers' compensation laws, and the United States Social Security Act, *inter alia.* (*Id.* at 7–8, 15–17.) The Benefits Booklet also contains this passage, pertinent to the dispute between the parties concerning the significance of the "Reimbursement Agreement" Prudential asks long-term disability beneficiaries to sign:

> Until you give Prudential written proof that you have completed [the process of applying for and securing Social Security benefits, or appealing any denial of such benefits through the Administrative Law Judge level], Prudential may: (1) estimate your monthly Social Security benefit; and (2) use that amount to determine your Adjusted Benefit. But, Prudential will not estimate Social Security benefits while your application and appeals are pending if you sign Prudential's Reimbursement Agreement.

(*Id.* at 16.) It is not disputed that the Benefits Booklet dated September 1993 was not distributed to DNLP employees covered by the DNLP Benefits Program. The parties also agree that no subsequent draft of the Benefits Booklet (there were several generated between September, 1993, and November, 1996) was distributed to eligible DNLP employees. (Rumeld Aff., Exh. D, Wooley Dep. at 64; Rado Aff. at ¶¶ 8–10.)

In July, 1997, Prudential and DNLP executed Group Contract No. GW–22581. (Prudential's Rule 56.1 Statement, Exh. J.)

The Group Contract is dated and expressly takes effect on January 8, 1993, and specifically incorporates by reference draft of the Benefits Booklet dated October 6, 1995 (hereinafter, the "Contract Benefits Booklet"), setting forth the terms of the different kinds of coverage available under the Contract, through the DNLP Benefits Program. (*Id.* at PRU. 00003, 00016, 00055, 00061.) The Contract Benefits Booklet provides that long-term disability coverage is to be made available to eligible participants in the Program in amounts equal to the difference between 60 percent of the covered employee's pre-disability monthly salary, and the total of certain "Periodic Benefits." (*Id.* at 00071–72, 00078–80.) These "Periodic Benefits" are defined under the Contract as including benefits received under any Workers' Compensation law, and the United States Social Security Act, among other sources. (*Id.* at 00079.) The Contract Benefits Booklet also contains language identical to that just quoted concerning the role of the "Reimbursement Agreement" in the determination of long-term disability benefits under the Plan. (*Id.*)

The parties agree that under the long-term disability plan in effect during the period of Maxwell's ownership of the paper, long-term disability benefits were subject to offsets equal to any sums received from Workers' Compensation or Social Security. (Rado Aff. ¶ 5, Exh. A at 2, 5–6; Pocchia Aff. at ¶ 4.) The parties disagree sharply, however, over whether the LTD Plan established by DNLP in 1993 should be construed to contain a similar provision.

According to plaintiff Pocchia, non-union employees were told about the LTD Plan early in 1993, at a meeting with the DNLP's Benefits Manager Linda Rado. Pocchia says that they were told of the reduction in benefits from 66⅔ percent to 60 percent of salary at the time of disability, and that employee contributions would no longer be required. (Pocchia Aff. at ¶ 5; Rado Aff. at ¶ 6.) He also says that no mention was made at the meeting of offset

provisions applicable to long-term benefits. (Pocchia Aff. at ¶ 4.)

Pocchia and Feifer recall that Rado distributed a document at the meeting, entitled "Daily News, L.P. Benefits Program Summary." (Pocchia Aff. at ¶ 5; Feifer Aff. at ¶ 4.) The same document was apparently also circulated around that time as an attachment to an inter-office memorandum to all "Exempt Employees" (meaning, all employees covered under the benefits program for non-union employees). (Rado Aff. at ¶ 8; Molina Aff. at ¶ 4.) The document contains three passages relevant to these proceedings. First, at the foot of the first page, in bold print and a font slightly smaller than the text above it, a disclaimer reads:

> This summary is for informational purposes only and is not intended to cover all details of the Plan. The actual provisions of the Plan will govern in settling any questions that may arise.

(Rado Aff., Exh. C.) Second, the section on long-term disability benefits, which broadly describes eligibility for the program and notes that "[t]he Company pays for the cost of a Long Term Disability benefit equal to 60% of your Basic Monthly Compensation," contains no mention of offsets that will apply against payments received from Workers' Compensation and Social Security. (*Id.*) Finally, the section on short-term disability does contain this provision concerning offsets:

> Short-term disability benefits will be offset by any payments for which you are eligible under the State Disability Benefits Law or the Workers' Compensation Law.

(*Id.*) Plaintiffs state, and defendants do not dispute, that between January, 1993, and the various dates on which they filed for disability benefits in 1994, they received no description of the terms of the LTD Plan, other than the summary distributed in

January 1993. (Pocchia Aff. at ¶ 7; Molina Aff. at ¶ 6; Feifer Aff. at ¶ 6.)

### B. *Plaintiffs' Disability Claims*

#### 1. *Pocchia*

In August 1993, Pocchia became disabled as a result of a work-related accident. He applied for and received benefits under the short-term disability plan, which were offset by the amounts he also received from Workers' Compensation. After receiving short-term benefits for the maximum six months, he applied for and received long-term disability benefits. At around the same time, he also applied for and received Social Security benefits. (Pocchia Aff. at ¶¶ 8–10.) Specifically, Pocchia was awarded $2,530 in monthly benefits under the LTD Plan, which when added to the $650 he received monthly from Workers' Compensation, came to 60 percent of his salary at the time of disability. (Rado Aff. at ¶ 12; Second Amended Complaint at 20.)

In October, 1995, Prudential sent a letter to Pocchia's attorney at the time, explaining that under the insurance contract governing the LTD Plan, Pocchia's benefits were subject to an offset for any amounts received from Social Security. (Rado Aff., Exh. F.) The letter enclosed a "Reimbursement Agreement" for Pocchia's signature, and further explained the terms of that agreement. By signing, the letter says, Pocchia agrees to reimburse Prudential for any amounts subsequently received from Social Security. The letter goes on to say that should Pocchia fail to sign, Prudential would reduce his LTD benefits by an amount equal to its best estimate of his Social Security benefit. (*Id.*) In the event, Pocchia never returned a signed Reimbursement Agreement to Prudential, and as a result, Prudential reduced his monthly LTD award by its estimate of his Social Security award, $1,148.[3] Upon

---

**3.** In his Memorandum of Law in support of his motion for summary judgment, counsel to plaintiffs claims that Pocchia was never asked by Prudential to sign a Reimbursement Agree-

ment. (Pl.Mem. of Law at 7.) For his part, Pocchia states that he "was never given any document by the DNBP or Prudential which included any such limitation on my long-term

learning that his Social Security benefits were slightly more than that amount, Prudential again adjusted Pocchia's LTD award. Prudential now claims that Pocchia received over-payments exceeding $24,000 before the proper measure of his offsets had been assessed. (Rado Aff. at ¶¶ 12–14.)

### 2. *Molina*

In 1993 Molina became disabled and filed a claim for short-term disability benefits. After six months, he applied for long-term disability benefits. Around the same time, he also applied for Social Security benefits. (Molina Aff. at ¶¶ 7–8.)

On being notified by Prudential in May, 1994, that he had been approved for long-term benefits, Molina was also informed that under the group insurance contract between Prudential and DNLP, amounts received from Social Security would be offset against those benefits. At that time, he was also provided with a Reimbursement Agreement for his signature. (Molina Aff. at ¶¶ 8–10.)

Molina states that this information prompted him to contact the Program, which referred him to Prudential. (*Id.*) Eventually, he spoke with a Prudential employee named Bryan Pickel, working as a Disability Claim Manager at the time. (Pickel Aff. at ¶ 1.) Molina says that Pickel told him that under the Plan, long-term disability benefits are subject to an offset for Social Security benefits. (Molina Aff. at ¶ 10.) Molina also alleges that Pickel told him that if Molina failed to sign the Reimbursement Agreement, he would receive no benefits. Fearful that he would never receive his long-term benefits, Molina signed the Agreement—under duress, he claims. (*Id.*)

Pickel states that, although he does not specifically recall a conversation with Molina, he would not have presented the alternatives in this fashion. Specifically, he says that he would have told a claimant in

Molina's position that unless he signed the Reimbursement Agreement, his benefits would be reduced by the amount of his Social Security benefits, as estimated by Prudential. If, on the other hand, Molina signed the Agreement, he would receive the full measure of his long-term benefits, but incur an obligation to reimburse Prudential for Social Security benefits in excess of the amount to which he was entitled under the Plan (namely, 60 percent of his pre-disability salary). (Pickel Aff. at ¶¶ 4–6.)

In June 1994, Molina began receiving long-term disability benefits of $1,566 per month, which, together with his Social Security award at the time ($1,296) amounted to 60 percent of his former salary. (Rado Aff. at ¶ 1, Exh. H.) The Social Security Administration subsequently twice adjusted his monthly benefit upward, resulting, say defendants, in over-payments to Molina exceeding $17,000. (Rado Aff. at ¶ 20.)

### 3. *Feifer*

Feifer took disability leave in August 1993, and received short-term disability benefits for six months. (Feifer Aff. at ¶ 5.) In 1994 he applied for and received long-term disability benefits under the Plan, amounting to $3,445 per month. (Rumeld Aff., Exh. N.) At around the same time Feifer also applied for and received Social Security benefits. (Feifer Aff. at ¶ 7.)

Like Molina, Feifer states that he spoke with Pickel about the Reimbursement Agreement, and like Molina, Feifer claims that Pickel told him that if he failed to sign, he would receive no long-term disability benefits. (Feifer Aff. at ¶ 8.) Once again, Pickel denies having presented the alternatives in this fashion, and maintains that, although he does not specifically recall speaking with Feifer, he would not have told him that he stood to lose all of his benefits if he failed to sign the Reimbursement Agreement. (Pickel Aff. at

disability benefits," and adds that the "issue arose for the first time only after I qualified

and was approved for long-term disability benefits." (Pocchia Aff. at ¶ 12.)

¶ 5.) In support of his contention, Pickel points to the Plan provisions governing the question, which authorize Prudential to estimate a claimant's likely Social Security benefits, and deduct those from his long-term benefits under the Plan, in the event that the claimant chooses not to sign the Agreement. (*Id.* at ¶¶ 4–6.)

Feifer did sign the Reimbursement Agreement, for the sole reason, he says, of avoiding the forfeiture of his long-term disability benefits. (Feifer Aff. at ¶ 9; Rumeld Aff., Exh. O.) In September, 1994, Feifer began receiving Social Security benefits in the amount of $1,204 per month, and accordingly, his monthly benefits under the Plan were reduced to offset those amounts. Since that time, pursuant to the terms of the Reimbursement Agreement he signed, Feifer has reimbursed almost $11,000 to Prudential in over-payments made before offsets for his Social Security benefits were assessed. (Feifer Aff. at ¶ 11.)

## DISCUSSION

### I. *Summary Judgment*

In considering a motion for summary judgment, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). This responsibility must be discharged even where both parties move for summary judgment, and agree that there are no issues of fact in the case. *Cargill, Inc. v. Charles Kowsky Resources, Inc.,* 949 F.2d 51, 55 (2d Cir.1991). A court should be mindful in such a case that unresolved issues must be material in order to survive summary judgment, and that "the mere existence of factual issues—where those issues are not material to the claims before

the court—will not suffice to defeat a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d at 11–12 (citation and internal quotations omitted).

### II. *Analysis of Plaintiffs' Rights Under the LTD Plan*

Plaintiffs argue that because defendants failed to make clear in advance that long-term disability benefits available to them under the LTD Plan were subject to offsets for benefits received under the state workers' compensation law, and the federal Social Security program, they were thereafter estopped from applying such offsets to plaintiffs' long-term disability awards. The crux of plaintiffs' argument is that the "Daily News L.P. Benefits Program Summary" distributed by DNLP Benefits Program Manager Linda Rado in January, 1993 (the "Rado Document"), is a "Summary Plan Description" ("SPD") under ERISA, and that as such, it controls over the terms of the Group Contract between DNLP and Prudential (the "Group Contract"), to the extent of any inconsistencies between the two. Observing that the document they characterize as an SPD is clearly inconsistent with the terms of the Group Contract on the issue of whether offsets apply to long-term disability benefits, plaintiffs infer that the SPD controls, and that the SPD clearly does not provide for such offsets. Plaintiffs conclude that they are entitled to receive long-term disability benefits without offsets. Accordingly, plaintiffs Pocchia and Molina are entitled to keep the alleged over-payments made to them, and plaintiff Feifer is entitled to be paid the amount he reimbursed to Prudential as an alleged over-payment.

So stated, the salient deficiency of plaintiffs' argument is apparent. Even assuming, without deciding, that they are correct in characterizing the Rado Document as an SPD, plaintiffs are clearly incorrect in concluding that it controls over the express

terms of the Group Contract.[4] This is so for two reasons well-established in ERISA case law: first, the Rado Document does not conflict with the terms of the Group Contract here at issue; second, even if it does, there is no evidence that plaintiffs either relied to their detriment on the Rado Document's failure to set forth those terms, or were otherwise prejudiced by that failure.

### 1. Conflict Between the Rado Document and the Group Contract

■ ERISA, and the regulations promulgated under it, require employers offering pensions and benefits plans covered under its statutory scheme to distribute an SPD to participants in those plans. *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907 (2d Cir.1990); *see* 29 U.S.C. §§ 1022(a)(1) (requiring that a plan description "shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan"); 1024(b)(1) (requiring employers to furnish "each participant with a copy of the summary plan description"). The rationale for this requirement was stated by the Court in *Heidgerd:*

[T]he statute contemplates that the summary will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary. To allow the Plan [here, the Group Contract] to contain different terms that supersede the terms of the Booklet [here, the Rado Document] would defeat the purpose of providing the employees with summaries. It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complicated document, and then proclaim that any inconsistencies will be governed by that plan. Unfairness will flow to the employee for reasonably relying on the summary booklet.

*Heidgerd*, 906 F.2d at 907–08 (citation and internal quotation marks omitted); *see also Moriarity v. UTC Plan*, 158 F.3d 157, 160 n. 1 (2d Cir.1998) (per curiam) (citing *Heidgerd* and collecting cases).

■ In this case, offsets for Social Security and workers' compensation benefits clearly apply to long-term disability benefits as defined and provided for under the Group Contract.[5] Such offsets are not

---

4. In fact, the Rado Document fails to qualify as an SPD under the statutory criteria. A summary plan description must contain 12 categories of information, of which the Rado Document appears to contain only three: the name and type of administration of the plan, the plan's requirements respecting eligibility for participation and benefits, and the identity of any organization through which benefits are provided. 29 U.S.C. § 1022(b); *see also Gridley v. Cleveland Pneumatic Co.*, 924 F.2d 1310, 1316 (3d Cir.), *cert. denied,* 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991) (concluding that an "overview brochure" concerning life insurance benefits did not constitute an SPD under 29 U.S.C. § 1022(b)). The situation in *Gridley* is distinguishable from the one *sub judice.* In *Gridley,* unlike this case, the employer had distributed a document that did incontestably constitute an SPD, alongside another document which the plaintiff purported to rely on as an additional SPD. *Gridley,* 924 F.2d at 1315–17.

5. Plaintiffs take the position that, because the Group Contract was not signed until July,

1997, it had no effect until that time, and that the only agreement between Prudential and DNLP between January, 1993, and the signing of the Group Contract was the Rado Document. (Kreisberg Aff. in Opp. at ¶¶ 3, 11–12.) This argument is unavailing. Where the parties have clearly manifested an intent to be bound by a contract, the contract is binding even before it is signed and executed. *See, e.g., Girard Life Insurance, Annuity & Trust Co. v. Cooper,* 162 U.S. 529, 543, 16 S.Ct. 879, 40 L.Ed. 1062 (1896); *Genesco, Inc. v. Joint Council 13, United Shoe Workers of Am., AFL—CIO,* 341 F.2d 482, 486 (2d Cir.1965); *Aini v. Sun Taiyang Co.,* 964 F.Supp. 762, 775 (S.D.N.Y.1997); *Helen Whiting, Inc. v. Trojan Textile Corp.,* 307 N.Y. 360, 364, 121 N.E.2d 367 (1954); *cf. Int'l Telemeter Corp. v. Teleprompter Corp.,* 592 F.2d 49, 58 (2d Cir.1979) (Friendly, J., concurring) (noting a line of New York cases holding that "when the parties have manifested an intention that their relations should be embodied in an elaborate signed contract, clear and convincing proof is required to show that they meant to be bound before the contract is signed and delivered").

mentioned in the Rado Document's description of the LTD Plan. Both the Rado Document and the Group Contract provide that long-term disability benefits available under the Plan shall not exceed 60 percent of pre-disability salary, but the Group Contract makes clear that this figure, whatever it may be for a given employee, shall include benefits received from such sources as workers' compensation and Social Security. By contrast, the Rado Document states simply:

> The Company [i.e., DNLP] pays for the cost of a Long Term Disability benefit equal to 60% of your Basic Monthly Compensation, up to maximum monthly benefit of $15,000.

(Rado Aff., Exh. C.)

Plainly, there is nothing so stark as an inconsistency between the pertinent provisions of the Rado Document and the Group Contract, particularly with respect to those provisions where courts are most sensitive about such inconsistencies. The SPD must inform employees of the "circumstances which may result in disqualification, ineligibility, or loss of benefits." 29 U.S.C. § 1022(b). Nothing about the alleged inconsistency here implicates concerns so drastic. Plaintiffs have all been receiving disability benefits under the LTD Plan since 1994, or 1995. None stand to be disqualified, or rendered ineligible as a result of an unfavorable finding regarding the application of offsets to their benefits. It is true, of course, that the application of offsets would result in a "loss of benefits" to plaintiffs, but this observation begs the question of whether that loss would be of *bona fide* "benefits," or rather of over-payments, to which plaintiffs never had a claim under either the Rado Document or the Group Contract. That question is easily answered in this case. Plaintiffs cannot be said to have suffered a "substantive harm" by reason of any vagueness or ambiguity in the Rado Document. *Veilleux v. Atochem North America, Inc.*, 929 F.2d 74, 76 (2d Cir. 1991). They have been and will continue receiving benefits that come to 60 percent of the pre-disability salary as employees of DNLP. This is what the Rado Document told them they could count on under the LTD Plan, and that is what the Group Contract provides for as well.[6]

Plaintiffs also fail to account for case law distinguishing situations in which the SPD and the underlying plan "directly conflict," and situations in which the SPD is silent. These cases have declined to find inconsistency dictating that the SPD should control over the terms of a plan where the SPD does not mention the provision in question. *See Mers v. Marriott Int'l*, 144 F.3d 1014, 1023 (7th Cir.) ("While the circuits agree that an SPD controls if a conflict exists between the underlying policy and the SPD, ... many of these courts also agree with us that this rule of construction should not be invoked if no direct conflict exists or if the SPD is silent on an issue that is described in the underlying policy....") (citations omitted), *cert. denied*, —— U.S. ——, 119 S.Ct. 372, 142

Here, DNLP was paying premiums and Prudential providing benefits as of January of 1993, pursuant to an agreement most of the terms of which had been memorialized in a "Benefits Booklet" produced by Prudential in September, 1993. (Prudential's Rule 56.1 Statement, Exh. I; Rado Aff. at ¶¶ 7–8.) This is proof, in the absence of any to the contrary, that there was a contract between DNLP and Prudential as of January, 1993, that its terms were substantially set forth in a writing as early as September, 1993, and that the parties intended to be bound by those terms, notwithstanding the delay in final execution of a signed agreement.

6. Whether or not offsets apply to those benefits certainly would affect plaintiffs' net after-tax income. DNLP calculates that if plaintiffs were found to be entitled under the LTD Plan to keep their Plan benefits without offsets applied for payments received from Social Security and workers' compensation, Feifer would end up with disability compensation exceeding his pre-disability salary, Pocchia would receive 81 percent of his pre-disability salary, and Molina, 95 percent. (Rado Aff. at ¶¶ 15, 21, 26.)

L.Ed.2d 307 (1998); *Sprague v. General Motors Corp.*, 133 F.3d 388, 401 (6th Cir.) ("An omission from the summary plan description does not, by negative implication, alter the terms of the plan itself."), *cert. denied*, —— U.S. ——, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998). The reason, as the Court observes in *Sprague*, "is obvious: by definition, a summary will not include every detail of the thing it summarizes." *Sprague*, 133 F.3d at 401; *see also Herrmann v. Cencom Cable Assocs., Inc.*, 978 F.2d 978, 983 (7th Cir.1992) ("Although a summary plan description should include matters that affect coverage, ... and prevails over the plan itself in the event of a conflict, ... no document can include every detail and remain a summary.") (citations omitted).

It is true, as plaintiffs point out, that the Rado Document mentions that offsets apply against *short-term* benefits for payments received under "the State Disability Benefits Law or the Workers' Compensation law." (Pocchia Aff., Exh. B.) It is also true that this tends slightly to magnify the fact that the Rado Document contains no similar provision in the section on long-term benefits. But the Rado Document also contains a disclaimer, written in bold type (albeit of a slightly smaller font) at the foot of the first page, indicating that it is "for informational purposes only," and "is not intended to cover all details of the Plan," and further advising that "[t]he actual provisions of the Plan will govern in settling any questions that may arise." (*Id.*) Several courts, including the Second Circuit, have found such provisions to be valid and binding, absent proof of detrimental reliance by the Plan participant. *See Amato v. Western Union Int'l, Inc.*, 773 F.2d 1402, 1418 (2d Cir.) (holding that statements in SPD reserving right to amend and indicating that the terms of the Plan "will govern in all cases" were unambiguous and precluded "any separate contract claim based solely on the language of the summary plan description"), *cert. dismissed*, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986), *abrogated on other grounds, Mead Corp. v. Tilley*, 490 U.S. 714, 109 S.Ct. 2156, 104 L.Ed.2d 796 (1989); *Snyder v. Elliot W. Dann Co.*, 854 F.Supp. 264, 274 (S.D.N.Y.1994) (same). In the final analysis, the Rado Document's omission, while regrettable, is simply not so misleading that it amounts to an inconsistency with the underlying Plan's very clear provisions concerning offsets.

Accordingly, there is no inconsistency between the Rado Document and the Group Contract, sufficient to implicate the underlying concerns of ERISA's disclosure provisions.

### 2. *Detrimental Reliance or Prejudice*

Even if the Rado Document were an SPD under ERISA, and even if the Rado Document were adjudged inconsistent with the Group Contract, plaintiffs would still have to show that they either relied to their detriment on the allegedly inconsistent provisions, or were otherwise prejudiced by those provisions. *See Manginaro v. Welfare Fund of Local 771*, 21 F.Supp.2d 284, 296 (S.D.N.Y.1998) ("Permitting a plaintiff to prevail upon a showing either of detrimental reliance upon, or possible prejudice flowing from, a faulty SPD, also appears consistent with the approach taken by the majority of courts to have considered this issue.") (citing cases); *Moriarity v. UTC Plan*, 947 F.Supp. 43, 52 (D.Conn.1996) (plaintiff "is entitled to recover only if he can establish that he lost his disability benefits as a result of his reliance on the deficiencies in the summary plan description") (citation omitted), *aff'd*, 158 F.3d 157 (2d Cir.1998); *Estate of Ritzer v. Nat'l Org. of Indus., Trade Unions Ins. Trust Fund*, 822 F.Supp. 951, 954–55 (E.D.N.Y.1993) (holding that a plaintiff need not show that "he or she in fact read and relied upon a faulty summary plan description in order to prevent an ERISA plan from enforcing an undisclosed provision," and refusing to enforce such a provision based on a finding of a "high probability" that plaintiff had been prejudiced by the faulty SPD); *cf. Lee v. Burkhart*, 991 F.2d 1004, 1011 (2d Cir.

1993) (assuming without holding that plaintiff must prove detrimental reliance where ERISA fiduciary misrepresents plan provisions in communications with employees).[7] At oral argument plaintiff's counsel conceded that plaintiffs could not show detrimental reliance, so this Court focuses its inquiry on the showing of prejudice to the plaintiffs.[8]

In fact, there is no showing of prejudice to plaintiffs due to the Rado Document's failure to mention the Group Contract's offset provisions. This is not a case, as has already been observed, in which plaintiffs were disqualified from receiving benefits, found ineligible to receive benefits, or even lost benefits. Here, the only prejudice plaintiffs seem to have suffered is that their long-term disability benefits do not exceed the 60 percent of pre-disability salary that the Rado Document, the Group Contract, and (according to Pocchia) Linda Rado herself all indicated as the ceiling on such benefits under the LTD Plan. If this is prejudice, it cannot be ascribed to inaccuracies or misrepresentations in the Rado Document.

Because plaintiffs cannot show that the Rado Document was materially in conflict with the Group Contract provisions regarding offsets to benefits under the LTD Plan, and cannot show either detrimental reliance on, or prejudice as a result of, those provisions, summary judgment is appropriate against them, dismissing their claims in their entirety.

## III. *Defendants' Counterclaims*

Defendants have counterclaimed against Plaintiffs Pocchia and Molina, seeking over-payments made to them before offsets for benefits received under workers' compensation and Social Security against their LTD Plan benefits were properly calculated, pursuant to guidelines set forth in detail in the Group Contract. For the reasons that follow, summary judgment is appropriate in favor of defendants on these counterclaims as well.

### 1. *The Counterclaim against Pocchia*

Pocchia claims that he never received "any document" from DNLP or Prudential regarding offsets against his benefits under the LTD Plan until "after I qualified and was approved for" those benefits. This account is corroborated by a letter, submitted by DNLP, from Prudential to Pocchia's attorney at the time, explaining the offsets provisions, and offering Pocchia a choice: signing the Reimbursement Agreement, and taking his benefits under the LTD Plan up front, with an obligation to repay any applicable offsets later; or, not signing the Reimbursement Agreement, letting Prudential estimate his eventual Social Security benefits, and reducing his LTD payments in accord with that estimate. (Rado Aff. at ¶ 13, Exh. F.) By not signing, Pocchia elected the second alternative, allowing Prudential to estimate and reduce his benefits. Unfortunately, in the lag created by the different time-lines along which his applications for benefits under the LTD Plan and Social Security proceeded, Pocchia ended up being overpaid under the LTD Plan by some $24,000 (according to the defendants' calculation). (Rado Aff. at ¶ 14.)

---

**7.** As these citations demonstrate, whether a showing of detrimental reliance is necessary to prevent enforcement of undisclosed plan terms, or whether a showing of prejudice would suffice by itself, is a question that is not entirely settled in this Circuit. In the analysis that follows, this Court follows the more expansive approach to the issue articulated by Judge Nickerson in *Ritzer*.

**8.** This concession is particularly striking in light of plaintiffs' reliance on *Heidgerd v. Olin Corp.* In *Heidgerd,* the Court "express[ed] no view as to the correctness of the ruling [by the district court] that proof of reliance is necessary to the enforcement of the terms of an ERISA plan summary." 906 F.2d at 909. In fact, although the *Heidgerd* Court held that the SPD at issue controlled over the terms of the contract Plan, it affirmed an award of damages on that basis only to the single plaintiff in the case (among over 170) who had demonstrated detrimental reliance. *Id.* at 907, 909–10.

The right of an ERISA plan administrator or insurer to recoup overpayment of benefits has been specifically enforced in ERISA cases. *See Cooperative Benefit Adm'rs, Inc. v. Whittle,* 989 F.Supp. 1421, 1430–33 (M.D.Ala.1997) (rejecting plaintiff's argument from estoppel principles for avoiding repayment of disability benefits subject to offsets for amounts received from Social Security); *Sarosy v. Metropolitan Life Ins. Co.,* No. 94 CV 5431, 1996 WL 426387 at *9 (S.D.N.Y. July 30, 1996) (holding that insurer has right to recoup disability benefits subject to offset for Social Security). As suggested by the Court's discussion in *Whittle,* this right is tempered by estoppel principles, but the Second Circuit has made clear that estoppel principles apply in the context of a dispute governed by ERISA "only under extraordinary circumstances." *Bonovich v. Knights of Columbus,* 146 F.3d 57, 62 (2d Cir.1998) (quoting *Schonholz v. Long Island Jewish Medical Center,* 87 F.3d 72, 78 (2d Cir.1996)).

This is clearly not such a case, for reasons already set forth. Pocchia has not shown either that he relied on any representation made by defendants to his detriment, or that he was otherwise prejudiced by such a representation. Indeed, Pocchia states that he was apprised of his obligation to reimburse overpayments "for the first time" when he was approved for benefits from the LTD Plan. (Pocchia Aff. at ¶ 12.) Thus, by his own account, he was on notice in 1995 that he might be liable for the very overpayments he now seeks to avoid reimbursing. (Pocchia Aff. at ¶ 10.) Accordingly, summary judgment is appropriate on defendants' counterclaim against Pocchia.

2. *The Counterclaim against Molina*

■ Molina signed a Reimbursement Agreement with Prudential which provides, in pertinent part:

I understand that the Policy [i.e., under which benefits under the LTD Plan are available] requires that my LTD benefits for any month or partial month as [sic] reduced by Workers' Compensation and any benefits received under the Social Security Act that I or members of my family receive, or would be entitled to receive as a result of my disability, for that same monthly period.... Should my claim for LTD benefits be approved, I request that Prudential postpone making the reduction of benefits described in the second paragraph of this agreement until I actually am awarded Workers' Compensation or Social Security benefits or complete the Social Security application process as described below.... If Workers' Compensation and/or any benefits under the Social Security Act are awarded retroactively, I agree to repay Prudential immediately the amount paid to me under this agreement in excess of the amount to which I would have been entitled under the terms of the Policy.

(Molina Aff., Exh. A.)

Molina claims, in substance, that he signed this Agreement only because he had been told by a Prudential employee that he stood to forfeit all of his benefits under the LTD Plan should he fail to sign. (Molina Aff. at ¶ 10.) This claim may fairly be deemed an attempt to avoid enforcement of the Reimbursement Agreement based on a claim of economic duress. Leaving aside the intrinsic implausibility of Molina's claim when set beside the case of Pocchia—who refused to sign the Reimbursement Agreement, and suffered nothing worse than an adjustment to his LTD Plan benefits in the amount of a Prudential estimate of his eventual retroactive Social Security award—and taking Molina's statement at face value, he nevertheless fails to make out even a *prima facie* case of economic duress, as a defense to the enforcement of the Reimbursement Agreement.

■ The defense of economic duress "must be based on a showing that a party was subjected to a 'wrongful threat precluding the exercise of free will.' " *War-*

*naco, Inc. v. Farkas,* 872 F.2d 539, 546 (2d Cir.1989) (citing *Austin Instrument, Inc. v. Loral Corp.,* 29 N.Y.2d 124, 130, 324 N.Y.S.2d 22, 272 N.E.2d 533 (1971)). Molina must also "demonstrate that [the Reimbursement Agreement] was obtained under the press of financial circumstances, with those circumstances permitting no other alternative." *Harless v. Research Institute of America,* 1 F.Supp.2d 235, 242 (S.D.N.Y.1998).[9] Because economic duress renders a contract voidable, but not void, the proponent of the duress defense must also show that he did not acquiesce to the contract by ratifying it. *Id.; see* Restatement (Second) of Contract § 175 (1979) ("A voidable contract is one where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance.").

Molina states that Pickel told him that "if I did not sign the Reimbursement Agreement and return it to him I would not receive any benefits under the DNBP." (Molina Aff. at ¶ 10.) Even if this is sufficient on its face to make out a wrongful threat, Molina alleges nothing more in support of a defense of economic duress. He does not allege that his financial circumstances were so dire as to permit no alternative but to sign. More tellingly, Molina says nothing to dispel the impression that he had several reasonable alternatives between forgoing his benefits, and signing a document against his will. He could have sought further advice from other officers at Prudential. He could have consulted an attorney. Indeed, he could have done what Pocchia elected to do, refused to sign, and challenge any actions taken by Prudential in response. He did none of these things, presumably, because upon due consideration, he decided to sign the agree-

ment. It follows that as a matter of law, he did not act under duress. He is therefore bound by its terms, which make clear that he is liable for any over-payments by Prudential of his benefits under the LTD Plan (slightly more than $17,000, by the defendants' calculations). (Rado Aff. at ¶ 20.) Accordingly, summary judgment is also appropriate on defendants' counterclaims against Molina.

*3. Feifer's Claim for Reimbursement*

As noted already, defendants brought no counterclaim against Feifer because he has repaid more than $10,000 to Prudential, pursuant to the terms of the Reimbursement Agreement, which he also signed. (Prudential's Rule 56.1 Statement at ¶¶ 46–47.) Feifer makes allegations similar to Molina's concerning a conversation with Pickel about the Reimbursement Agreement. (Molina Aff. at ¶¶ 8–9.) Pickel also denies having threatened Feifer with the loss of his benefits, and states, without specific recollection of the conversation, that he would have explained the Feifer had a choice between signing the Agreement and undertaking to repay excess Social Security payments later, and not signing, and allowing Prudential to deduct its estimate of that amount pending the determination by the Social Security Administration. (Pickel Aff. at ¶¶ 4–5.)

To the extent that Feifer seeks re-payment of the amounts already deducted from his long-term disability benefits in satisfaction of his obligations under the Reimbursement Agreement, that claim is dismissed, for the reasons already set forth with respect to Molina's claim for reimbursement.

*IV. Prudential's Motion for Costs and Attorneys' Fees*

■ Prudential seeks an award of attorneys' fees and costs under ERISA, 29

---

**9.** *See* John D. Calamari & Joseph M. Perillo, The Law of Contracts § 9–2 at 162 (1977) ("Where the coercion involves economic pressure rather than threat of physical injury ... an objective element continues to be demanded by the court. In the face of a threat of

'either ... or,' did the person threatened have some reasonable third alternative? For example, was there a judicial proceeding that could have produced prompt and adequate relief? If so, a case for duress would not be made out.").

U.S.C. § 1132(g)(1). Prudential offers no argument in support of its application, and indeed, there is no apparent basis in the record for it. The decision to grant attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) is determined by a five-factor test:

(1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorneys' fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants.

*Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869, 871 (2d Cir. 1987).

■ It is quite apparent that under this test, attorneys' fees and costs are not appropriate here. This is not evidently a case brought in bad faith; no doubt, the plaintiffs do acutely and sincerely feel the burden of their reimbursement obligations, notwithstanding their failure to sustain a legal claim on the basis of those feelings. In any event, it would be oppressive to assess legal costs and fees against persons on disability pensions, who are presumptively unable to satisfy such an award.

Accordingly, Prudential's § 1132(g) application for attorneys' costs and fees is denied.

## CONCLUSION

For the reasons set forth, plaintiffs' motion for summary judgment is denied, and defendants' motion for summary judgment dismissing plaintiffs' claims is granted, in its entirety. In addition, defendants' motion for summary judgment on their counterclaims against plaintiffs Pocchia and Molina is granted. Prudential's application for a judgment declaring its rights and obligations under the Group Contract is granted to the extent that such a judgment is set forth above. Finally, Prudential's application for attorneys' costs and fees pursuant to 29 U.S.C. § 1132(g) is denied.

SO ORDERED.