**William R. PARRY, Jr., et al.**

v.

**SBC COMMUNICATIONS, INC., et al.**

**No. 3:04 CV 128 JBA.**

United States District Court,
D. Connecticut.

June 27, 2005.

Ian O. Smith, Moukawsher & Walsh, Hartford, CT, Thomas G. Moukawsher, Moukawsher & Walsh, Groton, CT, for William R. Parry, Jr., et al.

Carla R. Walworth, Patrick W. Shea, Zachary R. Osborne, Paul, Hastings, Janofsky & Walker, Stamford, CT, Christopher J. Lynch, Halloran & Sage, Hartford, CT, for SBC Communications, Inc., et al.

**Substituted Ruling on Plaintiffs' Motion for Partial Summary Judgment [Doc. # 77]; SBC/SNET Defendants' Motion for Judgment on the Pleadings or in the Alternative for Summary Judgment [Doc. # 73]; Motion for Summary Judgment by Defendants Cingular Wireless LLC, Cingular Wireless Bargained Pension Plan and Cingular Wireless Bargained Pension Plan Trust [Doc. # 80]**

ARTERTON, District Judge.

At issue in this case is the proper interpretation of the plan amendments in the

pension plans of defendant SBC Communications Inc.'s ("SBC") subsidiary, the Southern New England Telephone Company ("SBC/SNET") and defendant Cingular Wireless LLC ("Cingular"). For the reasons discussed below, plaintiffs' motion for partial summary judgment is GRANTED in part and DENIED in part. The SBC/SNET defendant's motion is GRANTED. Cingular's motion is DENIED.

## I. Background

Plaintiffs are current and former employees of SBC/SNET and Cingular,[1] who claim they are entitled to certain cash balance pension benefits under the terms of their pension plans. All plaintiffs began their employment with SNET, and became employees of SBC in 1998 upon its purchase of SNET. In 2001, SBC transferred some plaintiffs to Cingular, which is a joint venture between SBC and BellSouth Corporation.

■ Since 1995, SBC/SNET has had in place a so-called "cash balance" pension plan for its employees, in which pension benefits are reflected in a hypothetical account balance ("Cash Balance Plan Account" or "CBPA") for each employee that increases each year as the employer adds service and interest credits. Although such plans resemble defined contribution plans in form, they are in fact defined benefit plans,[2] and are governed by ERISA's defined benefit plan rules. Thus, for example, the SBC/SNET plan defines "accrued benefit" not as the balance of an individual's account, but rather as follows:

> A Participant's CBPA [Cash Balance Plan Account] is a hypothetical account. A Participant's actual accrued benefit under the Plan is a monthly benefit,

---

1. Plaintiffs include Carl A. Stoelzel and John R. Wills, who are currently employed at SBC/SNET, and represent a class of current SBC/SNET employees who are eligible to retire under the Early Retirement Annuity Provision. Plaintiffs John Sweet, Frank S. Fiorella, Walter Giles, Williams Hammer, Peter M. Jacobs, Paul L. Marchand, George R. Moore, Marilyn A. Moore, Fred Nilsson, Georg Papp, Robert J. Pardon and Steven M. Wabuda retired from SNET/SBC in 2004, were eligible for the Early Retirement Annuity Provision, and elected to take their pensions as a lump sum. Plaintiffs Ramirez and Taylor retired from SBC/SNET in 2004, and elected to take their pension in the form of an annuity. Plaintiff Moultis retired in 2004 and had not decided which benefit form to elect when his request for administrative review was filed.

Plaintiffs Adam J. Burakouski, Raymond R. Cubeta, Thomas Ellis, Edward D. Giana, Michael C. Grossi, Gerald Lewis, John E. Link, Arnold J. Palmieri, and Lloyd M. Henry are currently employed at Cingular. Plaintiffs William R. Parry, George E. Bsullak, Joseph J. Demaria, Wayne F. Hosfelt, and Thomas A. Mahoney retired from Cingular in 2002, and requested lump-sum pension benefit distributions under the Plan.

2. Under ERISA a "defined contribution plan" is defined as "a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses...." ERISA § 3(34). A "defined benefit plan" is defined as any plan "other than an individual account plan." ERISA § 3(35). As the Second Circuit explained in *Esden v. Bank of Boston*, 229 F.3d 154 (2d Cir.2000), "[b]ecause the individual accounts, and the employer contributions and the interest credits to those accounts, are all hypothetical under a cash balance plan, it is classified as a defined benefit plan." *Id.* at 158 n. 6. While "cash balance plans" share some of the simplicity and portability of defined contribution plans, the "employer retains the funding advantages of a defined benefit plan, namely (a) actual contributions are made to a single trust fund, based on actuarial assumptions; therefore (b) the employer retains funding flexibility as long as the solvency of the plan is maintained; and (c) the investment experience in excess of the promised interest credits (as well as forfeitures of the non-vested benefits of any terminated participants) belongs to the employer." *Id.* at 158 n. 5.

commencing at his Normal Retirement Age, which is the actuarial equivalent of the participant's CBPA. Effective beginning September 18, 1998, such accrued benefit shall be computed by adding interest thereon projected to the Normal Retirement Age. The rate of interest shall be the Negotiated Interest Crediting Rate. Converting such amount into a lifetime pension shall be determined by multiplying the Participant's projected CBPA by the appropriate factor in Appendix A using the later of the Participant's age at Normal Retirement Age or the Participant's actual age, and dividing the resulting amount by 12.

SBC/SNET Plan ¶ 5.2.

In 2001, SBC/SNET and its union, Local 1298 of the Communications Workers of America ("CWA"), entered into negotiations over the terms of the cash balance pension plan for employees who chose to retire early. Many union members had been dissatisfied with the cash balance plan, and the union's aim during the 2001 pension negotiations was to "try and make up for the losses of the detrimental effects of the cash balance conversion as it related to the members who stayed with SNET." Declaration of Glenn P. Kalata, Sr. [Doc. # 123, Ex. 44] at ¶ 3. The Memorandum of Understanding, signed on February 6, 2001, provided as follows:

> For any regular bargained-for employee who retires during the period July 1, 2001 through December 31, 2004 and who (a) has completed 30 or more years of Benefits NCS [Net Credited Service], or (b) is age 55 or older with 20 or more years of Benefits NCS, and who is under age 65 when the pension distribution is effective, the monthly pension attributable to the CBP [Cash Balance Pension] account will be determined as though the participant was age 65. If the employee is under age 65 and elects distri-

bution of the CBP benefit as a single life annuity, the monthly pension benefit will be equal to the CBP account divided by 119.04.

Memorandum of Understanding ("MOU") [Doc. # 123, Ex. 32].

In 2001, approximately 64 SBC/SNET employees sought to retire early, and an outside actuary, Mellon HR Solutions, calculated their pension benefits by projecting the value of their cash balance accounts forward with interest credits to age 65, then applying the age 65 annuity factor of 119.04. These employees retired in reliance on the actuary's calculation, but before they received their retirement benefits, SBC rejected Mellon's benefits calculation, asserting that it overstated the pension benefits to which the employees were due under the 2001 MOU. In SBC/SNET's view, the MOU did not require the cash balance account to be projected forward with interest credits to age 65, only that the amount in the cash balance account would be multiplied by 119.04 (the age 65 annuity factor). The 2001 retirees ultimately settled with SNET, and the 2001 retirees who elected to collect their retirement benefits as an annuity received 60% of the additional sums they would have been entitled to under the benefit calculations furnished by Mellon. SNET settled with Mellon for half of that extra cost.

### The SBC/SNET Plan

After settling with the 2001 retirees, SBC amended the SNET Pension Plan on May 17, 2002. Under the SBC/SNET Plan, employees have the option of receiving their pension benefit as either a lump sum distribution or a lifetime annuity. As amended to reflect the Memorandum of Understanding, the applicable provisions of the SBC/SNET plan include the following:

## 7.3 Cash Balance Plan Account Distribution Options

Employees who terminate employment on or after March 31, 1995, for any reason and who are eligible for a service pension or a service disability pension or a deferred vested pension will be eligible to elect to receive a distribution of the vested CBPA, unless the amount to which they are entitled under the Early Out Offer or the Enhanced Pension benefit is greater, in which case the CBPA would not be payable. . . .

(a) Normal Form of Payment

The normal form of payment of the vested CBPA shall be a joint and survivor annuity for a married Employee, and a single life annuity for an unmarried Employee.

(b) Amount if Payable as a Single Life Annuity

The monthly payment amount of the CBPA, if payable as a single life annuity, shall be determined by multiplying the Employee's accrued monthly CBPA benefit at his Normal Retirement Age by the applicable factor in Table 6.7 in Appendix A using the Employee's age at the time of commencement of the pension benefit. The Employee's accrued monthly benefit is determined by multiplying the Employee's CBPA by the applicable factor in Table 6.6 in Appendix A using the Employee's age at the time of the commencement of the pension benefit. Effective January 1, 2000, the Employee's accrued monthly CBPA benefit is determined by:

1. projecting the Employee's CBPA from termination of employment to Normal Retirement Age using the Negotiated Interest Crediting Rate, and

2. dividing the amount from (1) immediately above by the applicable factor in table 6.1 in Appendix A using the Employee's age at Normal Retirement Age, and

3. multiplying the amount from (2) immediately above by the applicable factor in Table 6.7 in Appendix A using the Employee's age at the time of commencement of the pension benefit.

For any Regular Employee who (a) retires during the period July 1, 2001, through December 31, 2004, (b) either has 30 or more Years of Service or is age 55 or older with 20 or more years of Service, and (c) is under age 65 when the pension distribution is effective, the monthly pension attributable to the CBP account will be determined as though the Participant was age 65. If the Employee is under age 65 and elects distribution of the CBP benefit as a single life annuity, the monthly pension will be equal to the CBP account divided by 119.04. :

. . . . .

(e) Lump Sum Distribution Options for Regular Employees

At the time of termination of employment, an Employee (other than a Temporary Employee or a Job Bank Employee) may elect to receive 25%, 50% or 100% of the vested CBPA to be payable in a lump sum distribution.

Availability of lump sum distribution options after election to defer receipt of pension benefits upon retirement or termination shall be determined in accordance with the following provisions:

(1) The 25% or 50% lump sum distribution options shall not be available to any Employee who elects to defer receipt of pension benefits upon his retirement or other termination of employment.

(2) A Participant who terminated employment prior to September 18, 1998, and who elects to commence receipt of

benefits before January 1, 2000, shall not be permitted to elect a 100% lump sum.

(3) A Participant who terminated employment prior to September 18, 1998, and who has not commenced receipt of benefits as of December 31, 1999, shall be permitted to elect a 100% lump sum effective January 1, 2000.

The lump sum distribution of an Employee's CBPA as of the commencement date shall be the greater of:

(i) the Employee's CBPA; and

(ii) the present value of the Employee's accrued benefit as described in 5.2

. . . .

For any Employee who terminates Employment on or after October 21, 1997, the present value of the Employee's accrued benefit calculated pursuant to this paragraph (ii) shall be the present value of the annuity calculated as of Normal Retirement Age (or current age, if later) using the Applicable Interest Rate and the Applicable Mortality Table.

The SBC/SNET employees did not receive a copy of the plan, and instead received a Summary Plan Description ("SPD"). The SPD summarized the early retirement benefit as follows:

**Enhanced CBPA Annuity.** Effective July 1, 2001, notwithstanding any other provision of this Plan, any regular bargaining unit employee who:

- Retires during the period beginning July 1, 2001, and ending Dec. 31, 2004,

- Is under the age of 65 when the pension distribution is effective and either(a) has completed 30 or more years of Credited Service or (b) is the age of 55 or older with 20 or more years of Credited Service, and

- Elects an annuity form of payment will receive the greater of:

- The monthly pension attributable to the CBPA determined as though the participant was the age of 65, or

- The monthly pension attributable to the CBPA determined under the otherwise applicable provisions of the Plan.

SBC Summary Plan Description, SNET Pension Plan [Doc. # , Ex. 35] at 29.

### Cingular Plan

Although Cingular was not a party to the collective bargaining that led to the MOU, Cingular assumed the obligations of SBC/SNET under the collectively bargained cash balance plan for several employees who transferred employment from SBC/SNET to Cingular in 2001. SBC/SNET transferred assets and liabilities to Cingular's Plan to provide for each transferring employee's pension benefit. Cingular states that it sought to incorporate SBC/SNET's benefit provisions for the transferred employees, and used Mellon as a resource in establishing its pension systems for those transferred employees. *See* [Doc. # 82, Vol. VII] at CIN 2140. Neither Mellon nor SBC/SNET notified Cingular of the disputed early retirement benefit calculations resulting in the settlement with the 2001 SBC/SNET retirees.

The Cingular Plan issued on November 1, 2001 provides as follows:

3.1 *Determination of Accrued Benefit.*

(a) *General Rule.* Except as provided in subsections (b) or (c) hereof, a Participant's Accrued Benefit as of any Date of Determination is a monthly Life Annuity benefit, commencing at his Normal Retirement Age, that is equal to (1) or (2) as follows:

(1) Before Normal Retirement Age. For a Date of Determination prior to the date on which the Participant attains Normal Retirement Age, the

quotient of (i) the amount determined by beginning with such participant's Cash Balance Account as of such Date of Determination, and projecting such account balance forward to his Normal Retirement Age by adding Interest Credits (using the Interest Crediting Rate in effect on the Date of Determination), but not Service Credits, to such Cash Balance Account for the period ending on the date he attains Normal Retirement Age; divided by (ii) the product of (A) 9.92; multiplied by (B) 12 . . . .

(b) Transferred Employees. Notwithstanding subsection (a) hereof, the Accrued Benefit of a Transferred Employee as of any Date of Determination shall never be less than the sum of his Frozen Core Pension Benefit, plus (1) or (2) as follows:

(1) Before Normal Retirement Age. For a Date of Determination prior to the date on which the Participant attains Normal Retirement Age, the quotient of (I) his Frozen Enhanced Cash Balance Account; divided by (ii) the product of (A) 9.92; multiplied by (B) 12 . . . .

(c) Transferred Employees Terminating Prior to January 1, 2005. Notwithstanding subsections (a) or (b) hereof, the Accrued Benefit of a Transferred Employee who terminates employment with all Affiliates prior to January 1, 2005, shall never be less than the monthly benefit, commencing at his Normal retirement Age, that is the Actuarial Equivalent of the single sum amount determined pursuant to Section 6.2(b)(2)(E).

Section 6.2(b)(2)(E) provides: with regard to a Transferred Employee who terminates employment with all Affiliates prior to January 1, 2005, the sum of (i) the Actuarial Equivalent of such Transferred Employee's Frozen Core Pension Benefit, determined using the Transferred Employee's age on July 1, 2001, and using 5.78% as the Applicable Interest Rate, plus (ii) such Transferred Employee's Frozen Enhanced Cash Balance Account.

Cingular Wireless Bargained Pension Plan, CWA District 1 Program, Effective November 1, 2001 [Doc. # , Ex. 36] at 20, 29.

The Cingular SPD included the following provisions:

### Accrued Benefit

Your Accrued Benefit under the Program is a monthly benefit that will begin once you reach Normal Retirement Age and will continue for the remainder of your life (such a lifetime benefit is referred to as a "Life Annuity"). If your Accrued Benefit is paid in a different form or prior to your Normal Retirement Age, certain adjustments may apply. These adjustments are described in greater detail in later sections of the Summary Plan Description. If you have not yet reached age 65, your Accrued Benefit is Equal to the monthly annuity that your Cash Balance Account could purchase if it continues to earn Interest Credits (but not Service Credits) until you reach age 65. The annuity value of your Cash Balance Account (once it has been projected to age 65) is determined by dividing the projected amount by 119.04.

The Cingular SPD includes the following example:

Example . . . on January 1, 2003, you are age 50 and have a Cash Balance Account of $50,000. Your Accrued Benefit is determined by taking the following steps:

Step 1: Your Cash Balance Account is projected to age 65 using the applicable monthly rate of Interest

Credits. *See* "Interest Credits" above for more information.

$50,000 × 1.00565 × 1.00327 = $93,463.75

Note that the monthly Interest Credit rate is 0.656% for the 16 months from January 2003 through April 2005 and that it decreases to 0.327% for the remaining 164 months until January 2018 (when you reach age 65).

Step 2: The amount determined in Step 1 is divided by 119.04.

$93,463.75 / 119.04 = $785.15.

Your Accrued Benefit under the Program is $785.15 per month commencing when you reach age 65.

Further, the Cingular SPD explains the consequences of early retirement as follows:

If You Want To Receive Your Benefits Early

. . . . .

If you choose to receive payments prior to age 65, your Accrued Benefit will be adjusted by a certain percentage. The "Early Retirement Factor Table" on pages 30–32 shows the amount you multiply your Accrued Benefit by to determine the amount of your monthly payments commencing prior to age 65. The earlier you retire, the smaller your monthly payments will be.

**Unreduced Early Benefits**

If you elect to begin your benefit payments prior to January 1, 2005, and you have 20 or more years of Net Credited Service and have attained age 55, your Accrued Benefit will not be reduced for early commencement. Additionally, if you elect to begin your benefit payments prior to January 1, 2005, and you have 30 or more years of Net Credited Service, your Accrued Benefit will not be reduced for early commencement at any age.

Any payments beginning on or after January 1, 2005 will be subject to the Early Retirement Factors if they commence prior to age 65.

***Early Retirement of Cingular Plaintiffs***

In the fall of 2002, plaintiffs Parry, Bsullak, Demaria, Hosfelt, and Mahoney requested estimates from Cingular of the early retirement pension benefits they were eligible for under the Cingular Plan. Fidelity Advisory Services ("Fidelity"), Cingular's pension administrator, provided the estimates, using the same calculation as Mellon had with regard to the 2001 SBC/SNET retirees, that is, projecting the CBPA forward with interest credits to age 65, then dividing that figure by 119.04, the age 65 annuity factor. Fidelity also informed these plaintiffs that lump-sum distributions were available in addition to annuities. After receiving the estimates from Fidelity, these five plaintiffs retired effective January 2003.

Shortly thereafter, Cingular learned of the pension estimates and determined that they overstated the amount due to these plaintiffs. Lew Walker, Vice President for Human Resources Operations and Labor at Cingular, wrote to the five retirees and explained that:

The pension calculation contained two errors. First, a programming error occurred that resulted in an overstatement of the annuity amount. The cash balance amount was projected forward with interest credits and should not have been. Second, the calculation showed an overstated lump sum. The lump sum available under the Plan is your current Cash Balance Account.

*See, e.g.* Letter from Lew Walker to George E. Bsullak, Feb. 21, 2003 [Doc. # 82] at CIN 301.

Cingular offered these retirees the same settlement that had been offered to the 2001 SBC/SNET retirees, providing that Cingular would increase their annuity by 60% of difference between the annuity amount estimated by Fidelity and the annuity amount Cingular believed to be correct. *See, e.g. id.* The retirees were also given the options of: re-employment; accepting a lump sum payment equal to the value of the cash balance account, with interest accruing at a rate of 7% between the date of termination and the date of payment; or accepting certain other payment options based on what Cingular believed to be the correct annuity amount. All of the retired Plaintiffs had elected lump-sum distributions, and rejected the settlement offer.[3]

On April 16, 2003, counsel for plaintiffs wrote to Cingular that he had reviewed all of the pertinent documents with his actuary, and asserted that the original estimate provided to the retirees by Fidelity was correct. Attached was an opinion by actuary Claude Poulin, which provided in relevant part:

> Paragraph 3 of the Pension section of the Memorandum of Understanding reads as follows: ... ["]**the monthly pension attributable to the CBP account will be determined as though the participant was age 65.** If employee is under age 65 and elects distribution of the CBP benefit as a single life annuity, the monthly pension benefit will be equal to the CBP account divided by 119.04." (Emphasis added).
>
> In my opinion, the calculations which base the monthly pensions on the cash balance (CBP) accounts at the partici-

pant's attainment of age 65 are the proper ones. Any other interpretation would make the emphasized section above redundant since, in the last sentence of the cited paragraph, the number 119.04 is actually the age 65 conversion factor found in the SNET Pension Plan. Moreover, under IRS Notice 96–8, the accrued benefit payable as an annuity under a cash balance plan must include the interest credits up to age 65, the plan's normal retirement age.

Letter from Claude Poulin to Thomas Moukawsher, April 15, 2003 [Doc. # 82] at CIN 269–70.

Thus, by Mr. Poulin's interpretation, the retirees were entitled to the benefits they would have received had they collected their benefits at their normal retirement age, instead of receiving the distributions at the time of their early termination of employment. Mr. Poulin found that the lump sum calculations originally provided to the retirees, which did not reduce the future interest credits to present value, were correct.

Cingular processed this letter as a claim for benefits, and in a letter decision issued on April 25, 2003, Mary Allen, Cingular's Director of Retirement Planning and Administration, rejected the plaintiffs' pension calculations. In particular, Ms. Allen stated:

> In reviewing your claim, we considered all the information in your April 16 letter and attachment and also reviewed the provisions of the MOU and IRS Notice 96–8. We disagree with your assertions concerning the application of

**3.** Although the February 21, 2003 letter stated that the lump sum was equal to the current Cash Balance Account, in calculating the lump sum Cingular in fact employed a "whipsaw" calculation required by ERISA § 203(e) and Internal Revenue Code § 417(e), in which it added interest credits to age 65, converted that amount to an annuity, and then reduced the future annuity back to a lump sum present value. *See Esden v. Bank of Boston,* 229 F.3d 154, 159 (2d Cir.2000).

paragraph 3 of the MOU and also believe that you failed to consider the final sentence of paragraph 3 of the MOU as well as other provisions of the MOU. The phrase from paragraph 3 that Mr. Poulin emphasized in his letter means simply that the monthly pension benefit of employees calculated under paragraph 3 of the MOU will *not* be subject to reduction under the Plan's early retirement commencement factors that normally apply to participants who retire prior to age 65. The last sentence of paragraph 3, which you and Mr. Poulin did not address, supports this and provides the clear direction on how to calculate the monthly benefit for an employee eligible for the benefit under paragraph 3: "If the employee is under age 65 and elects distribution of the CBP benefit as a single life annuity, the monthly pension benefit will be equal to the CBP account divided by 119.04." The methodology stated in that final sentence was used in calculating the correct annuity amounts communicated to your Clients . . . .

Finally, both you and Mr. Poulin assert that your Clients are entitled to the incorrect lump sums originally communicated to your Clients. We also disagree with this. Paragraph 5 of the MOU, which you did not address, specifies the lump sums available to employees such as your Clients. The lump sum you have requested is not available.[4]

Letter from Mary Allen to Thomas Moukawsher, April 25, 2003 [Doc. # 82] at CIN 259–260.

On May 1, 2003 plaintiffs' counsel filed an appeal of this decision with Cingular's Administrative Committee, and in a decision issued on August 12, 2003, the Administrative Committee upheld the denial of plaintiffs' claims for benefits. In particular, the Committee reasoned that

paragraph 3 on page 126 of the MOU *only* applies to those employees who meet the age and service requirements for the Special Retirement Provision *and* who elect the annuity form of payment. By its terms, it only applies to 'the *monthly* pension attributable to the CBP account.' . . . . [Further,] all of the sentences of paragraph 3, particularly the last sentence, must be read together in calculating an annuity for an employee under the Special Retirement Provision. The Committee concluded that the next to the last sentence provides general instruction for calculating the benefit and the final sentence states specifically how the benefit is to be calculated.

Letter from Monty Hill, Secretary—Administrative Committee, to Thomas Moukawsher, August 28, 2003 [Doc. # 82] at CIN 198.

The Committee also considered the CWA union's view of the agreement they had reached in 2001, and concluded that (1) the union had affirmed the Committee's benefits calculation in a CWA member

---

4. The letter further states: "We also reviewed IRS Notice 96–8. We disagree with your interpretation of that Notice as well and believe the calculations provided to your Clients comply with the provisions of that Notice. As you know, in Mr. Will's April 2, 2003 letter to your clients, we did acknowledge that the earlier communications to your Clients had failed to include the Code Section 417(e) lump sum minimums. For three of your Clients, Mr. Mahoney, Mr. Hosfelt and Mr. Bsullak, those lump sums were the highest lump sums, and we have agreed to provide those lump sums. In calculating the Section 417(e) minimum lump sums, we did project the current cash balances to age 65 with interest credits and follow the other applicable provisions contained in the Notice." Letter from Mary Allen to Thomas Moukawsher, April 25, 2003 [Doc. # 82] at CIN 260.

spreadsheet that was designed as a pension calculator tool for employees; (2) a summary of the MOU prepared by the union for employees emphasized that the negotiated early retirement benefit applied only to the annuity form of payment; (3) the CWA wrote to SBC and Cingular, stating its belief that the companies "misinterpreted" the provisions of the MOU document, resulting in "inflated" monthly annuity amounts. *See id.* at CIN 198–199. Among the Committee's other considerations were that the higher benefits calculations "had only been provided at the time of retirement and that prior to that time, correct estimates were provided;" "the language of the SPD supported the revised, corrected retirement calculations;" and "as part of the asset transfer to the Plan [at the time Cingular was formed and SBC/SNET employees transferred employment], SBC and the SNET Plan did not transfer assets to cover the overstated annuities or the overstated lump sums as the liability evaluation was based on the correct calculation methods contained in the MOU." [5] *Id.* at CIN 200–201.

On January 26, 2004, six months after receiving this decision, the five Cingular retirees filed suit, along with nine current Cingular employees and sixteen others who were subject to the SBC/SNET Plan. The nine current Cingular employees subsequently submitted an administrative claim, and appealed the denial of that claim to the Administrative Committee, thereby exhausting their administrative remedies. In the course of administratively appealing their claim, counsel for the nine current Cingular employees argued

for the first time that Cingular's benefits calculation was in conflict with the Cingular Plan and the SPD, not simply with the MOU. Rejecting this new argument, the Administrative Committee "noted that there are inconsistencies between the Plan, the SPD and the MOU. However, in resolving these inconsistencies, the Committee concluded that the clear language of the MOU reflects the language negotiated and agreed on by SBC and the CWA and, therefore the MOU must prevail." Letter from Monty Hill, Secretary, Administrative Committee, to Thomas G. Moukawsher, July 15, 2004 [Doc. # 82] at CIN 3231. The Committee also found that "any unilateral modification of the MOU by Cingular would violate federal law." *See id.*

### Early Retirement of SBC/SNET Plaintiffs

The SBC/SNET plaintiffs submitted their claim for benefits to the SNET Claims Administrator on April 1, 2004.[6] In claim denial letters issued to the SBC/SNET plaintiffs on April 23 and 26, 2004, the SBC Plan Administrator found that "[n]either the plan document nor the MOU state that participants are eligible for interest credits until age 65. In addition, the Plan's legal counsel has opined that the benefit calculation procedures were in accordance with applicable law." *See* Claim Denial Letters [Doc. # 75, Ex. B] at SBC 1623–24, 2108–09, 2171–72, 2237–28, 2294–95, 2353–54, 2412–14, 2472–73, 2526–27, 2584–85, 2645–46, 2710–11, 2768–69, 2840–41, 2898–99, 2953–54. The SBC/SNET plaintiffs appealed to the Benefit Plan Committee on April 28, 2004, challenging

---

**5.** Section 11.6 of the Cingular Plan provides: "Notwithstanding anything herein to the contrary, the transfer to the Plan of any liabilities or benefits from any prior plan (including, but not limited, those transferred benefits explicitly described herein) is expressly contingent upon the transfer of assets from such prior

plan sufficient to fund such liabilities or benefits."

**6.** The SBC/SNET plaintiffs had not yet exhausted their administrative remedies at the time suit was filed, and the Court stayed this action to allow the plaintiffs to do so.

SBC's interpretation of the Plan language and arguing that SBC's interpretation of the early retirement benefit as applying only to the annuity form of payment, not to other benefit forms, was contrary to law. In particular, plaintiffs argued that because ERISA requires that alternative benefit forms must be at least the actuarial equivalent of the normal retirement annuity, "[t]he Age–65 Treatment Provision cannot be applied SBC's way because SBC's application would enhance the annuity payable under the Plan by applying the age–65 conversion factor but would not enhance the alternative lump sum benefit available." Request for Review Letter from Thomas G. Moukawsher to SBC Benefit Plan Committee, April 28, 2004 [Doc. # 75, Ex. B] at SBC 1663–64. Plaintiffs also argued that SBC's interpretation would place "impermissible conditions on claimants' receipt of benefits," causing an illegal forfeiture under ERISA. *See id.* at SBC 1664. The SBC Benefit Plan Committee denied plaintiffs' appeal on June 17, 2004, concluding without further explanation that "neither the Plan's language nor the intent of the bargainers required such interest credits," and that plaintiffs' legal arguments "were without merit." Letters from Christine Holland, Secretary, Benefit Plan Committee, to Thomas Moukawsher, June 17, 2004 [Doc. # 75, Ex C].

## II. Discussion

### A. SBC/SNET Plan

#### 1. Standard of Review

 "A denial of benefits challenged under Section 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

"Where the plan reserves such discretionary authority, denials are subject to the more deferential arbitrary and capricious standard." *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 249 (2d Cir.1999). "The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies, since 'the party claiming deferential review should prove the predicate that justifies it.'" *Id.* (quotation omitted).

Both the SBC/SNET Plan and the SPD provided to the employees explicitly give the plan administrator full discretion to interpret the plan. Section 9.6(d) of the Plan provides:

> The Committee and each Claims Administrator and each subcommittee to whom claim determination or review authority has been delegated shall have full and exclusive authority and discretion to grant and deny claims under the Plan, including the power to interpret the Plan and determine eligibility of any individual to participate in and receive benefits under the Plan.

SBC/SNET Plan [Doc. # 75, Ex. A] at SBC 540.

The SBC/SNET SPD similarly informs employees that the plan administrator retains full discretion to interpret the plan. Plaintiffs argue first, however, that because the Committee interpreted the MOU rather than the SBC/SNET Plan when it denied plaintiffs' administrative claim, and because the MOU does not contain a reservation of discretion in the plan administrator, the *de novo* standard of review applies. As to the SBC/SNET defendants, this argument must fail, because the MOU merely amended the existing SBC/SNET Plan, and its terms in fact had been incorporated into the SBC/SNET Plan at the time the plaintiffs brought their claims for benefits. *See* SBC/SNET Plan [Doc. # 75,

Ex. A] at § 7.3. Moreover, both the plan administrator's initial denial letter and the Benefit Plan Committee's final decision clearly reference the Plan itself, which they conclude is consistent with the MOU terms. *See* Claim Denial Letters [Doc. # 75, Ex. B] at SBC 1623–24 et al.; Letters from Christine Holland, Secretary, benefit Plan Committee, to Thomas Moukawsher, June 17, 2004 [Doc. # 75, Ex. C].

Plaintiffs, relying on *Rabin v. Cheseb-rough–Pond's Inc.*, 1991 U.S. Dist. LEXIS 21754, * 49 (D. Conn. June 26, 1991), also argue that de novo review is appropriate because the terms of the plan are mandatory and unambiguous. In *Rabin*, the district court found that although the plan contained provisions "granting some discretion to the committee of outside directors designated to administer the plans, the change in control provisions are mandatory in nature; decisions involving their application are therefore subject to de novo review." *Id.* Here, the SBC/SNET plan is unambiguous in granting the plan administrator full discretion to interpret the plan. In light of the clear weight of Supreme Court and Second Circuit authority requiring an arbitrary and capricious standard of review where there is a such a reservation of discretion, this Court declines to read *Rabin* to broadly carve out the exception plaintiffs seek. Such an exception for mandatory plan terms would overtake the well-established rule, and mandatory plan terms can be appropriately accounted for even applying the deferential standard.

■ In addition, plaintiffs argue that the Court should not defer to plan administrators in this case because their interpretation of plan documents was affected by a conflict of interest. According to plaintiffs, "the circumstances of this case prove without further evidence that the companies' large financial stake in the matter has 'some connection' to the denial of the employees' administrative claims." *See* Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment [Doc. # 123] at 23. "[T]he existence of such an alleged conflict does not operate to change the standard of review, but rather becomes 'a facto[r] in determining whether there is an abuse of discretion.'" *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir.1995) (quoting *Bruch*, 489 U.S. at 115, 109 S.Ct. 948) (internal quotation omitted). Thus, the Second Circuit instructs that it is appropriate to review the Committee's decision under the arbitrary and capricious standard, "irrespective of whether the . . . Committee was operating under a possible or actual conflict of interest." *Id.* (citing *Heidgerd v. Olin Corp.*, 906 F.2d 903, 908 (2d Cir.1990)). Even if an actual conflict of interest is shown, the test for determining whether the administrator's interpretation of the plan is arbitrary and capricious requires the following two inquiries:

> First, whether the determination made by the administrator is reasonable, in light of possible competing interpretations of the plan; second, whether the evidence shows that the administrator was in fact influenced by such conflict. If the court finds that the administrator was in fact influenced by the conflict of interest, the deference otherwise accorded the administrator's decision drops away and the court interprets the plan de novo.

*Sullivan v. LTV Aerospace & Def. Co.*, 82 F.3d 1251, 1255–56 (2d Cir.1996).

■ Because the SBC/SNET plan documents contain a reservation of discretion giving the Plan Administrator full authority to interpret the Plan, and because a conflict of interest is not a basis for *de novo* review, but is a factor to be considered in determining whether the decision

was arbitrary and capricious, the Court will apply the more deferential standard to the decision of the SBC/SNET plan administrators. Under this standard, a court "may overturn a decision to deny benefits only if it was without reason, unsupported by substantial evidence [7] or erroneous as a matter of law. This scope of review is narrow, thus [a court is] not free to substitute its own judgment for that of the [Plan Administrator] as if we were considering the issue of eligibility anew." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir.1995) (citations and internal quotation marks omitted); *see also Bowman Transp., Inc. v. Arkansas–Best Freight Sys.*, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) ("A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.") (quotation omitted).

### 2. Analysis

#### a. Early Retirement Annuity

■ SBC/SNET's decision to deny plaintiffs' claim for benefits was based on its construction of the text of the relevant plan documents. Plaintiffs dispute the plan administrator's interpretation and assert that the plain meaning of the MOU, reflected in the provision that "the monthly pension attributable to the CBP account will be determined as though the participant was age 65," is a promise that "employees will get the pensions they would get at age 65 at an earlier age." Plaintiffs' Memorandum in Support of Their Motion for Partial Summary Judgment [Doc. # 78] at 29. While plaintiff's construction is reasonable, it is not the obvious or the

only interpretation. SBC/SNET's view, that this provision means only that they will treat the monthly pension attributable to the employee's *existing* CBP account in the manner they would if the employee were age 65, is as consistent as plaintiffs' view that the provision requires a projection of what the CBP account would be when the employee in fact reaches age 65.

In reaching their decision, the SBC/SNET Committee also considered the sentence that followed in the MOU, and which is incorporated as well into Section 7.3(b) of the SBC/SNET Plan, namely:

> If an employee is under age 65 and elects distribution of the CBP benefit as a single life annuity, the monthly pension benefit will be equal to the CBP account divided by 119.04.

It is SBC/SNET's position that this provision demonstrates how to carry out the general intent of the preceding sentence. Plaintiffs respond by arguing first that neither the SNET Plan nor the SPD contains the second sentence. Although Section 7.3 of the SBC/SNET Plan includes both relevant sentences from the MOU, plaintiffs focus on Supplement 18, which was added to the plan to memorialize the MOU and SBC/SNET's settlement with the 2001 retirees, and provides only that the early retirement benefit is the greater of "(1) the monthly pension attributable to the CBPA determined as through the Participant was age 65, or (2) the monthly pension attributable to the CBPA under the otherwise applicable provisions of the Plan." *See* SBC/SNET Plan, Supplement 18, June 1, 2003. [Doc. # 123, Ex. 34] at 143. Plaintiffs argue that Supplement 18 of the SBC/SNET controls because it ap-

---

7. Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] ... *requires more than a scintilla but less than a preponderance.*"

*Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir.1995) (citations and internal quotation marks omitted) (alteration in original).

plies "[n]otwithstanding any other provision of this Plan." *See id.* at 143: The SPD uses identical language to describe the early retirement benefit. *See* SBC/SNET SPD [Doc. # 123, Ex. 35] at 29. Even though standing alone, the descriptions of the early retirement benefit in Supplement 18 and the SPD are ambiguous, the Committee's ultimate interpretation of the Plan is not inconsistent with the SPD or Supplement 18.[8] In the absence of conflicting plan provisions, the "notwithstanding" language in Supplement 18 need not be invoked. Moreover, this is not a case in which the terms of the Plan conflict with those of a plan summary relied on by employees, and it is therefore possible and preferable to construe the plan documents consistently as a whole. *Compare Heidgerd v. Olin Corp.*, 906 F.2d 903, 908 (2d Cir.1990) (holding that where "the terms of a plan and those of a plan summary conflict, it is the plan summary that controls" because the summary is the employee's primary source of information) with *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir.2002) (stating general rule that it is appropriate to "review the Plan as a whole, giving terms their plain meanings."); *Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir. 2002)(It is a "cardinal principle of contract construction[ ] that a document should be read to give effect to all its provisions and to render them consistent with each other.").

Plaintiffs also contend that SBC/SNET's construction of the provision makes the second sentence "superfluous and misleading—superfluous because the words no longer have any meaning independent of the words that immediately follow them—

misleading because reading the language this way suggests that the only difference between the benefits of an employee retiring at age 65 and the benefits of an employee retiring at age 52 is that the older employee's annuity is calculated using a more favorable conversion factor," when "the larger difference in benefits between the two ages is the extra interest credits the older employee earns, not the use of the age–65 conversion factor." Plaintiffs' Memorandum of Law in Support of their Motion for Partial Summary Judgment [Doc. # 78] at 29–30. Plaintiffs thus insist that the only reasonable construction would require the Plan Administrator to project forward the employee's CBP balance with interest credits to age 65, and then apply the age 65 conversion factor to that amount. Plaintiffs' construction, however, requires ignoring the calculation provision altogether, because by its plain terms, the provision that "the monthly pension benefit will be equal to the CBP account divided by 119.04" would not permit the projection of interest credits forward to age 65. Nor can it be said that the early retirement provision is meaningless. While SBC/SNET's construction would not provide early retirees with unreduced benefits, the use of the early retirement conversion factor has the effect of partially subsidizing the early retirement benefits. The Committee's view that the calculation provision explained how to give effect to the general mandate to determine the monthly pension attributable to an employee's CBP "as though the participant was age 65" is reasonable, and does not render any part of the plan superfluous.

---

**8.** Plaintiffs argue that any ambiguities in ERISA plans should be construed against their drafters. *See Masella v. Blue Cross and Blue Shield*, 936 F.2d 98, 107 (2d Cir.1991) (concluding that where a *de novo* standard of review applies, it is appropriate to construe ambiguities in an ERISA plan against the drafter). Because *Masella* applies only where a court is undertaking a *de novo* review, it does not require such a result in a case reviewed under the arbitrary and capricious standard.

The MOU provisions were incorporated into Section 7.3(b) of the SBC/SNET Plan, the section providing for the "Amount if Payable as a Single Life Annuity." *See supra* at 5–6. This subsection is not a model of clarity, and offers three separate possible calculations for the monthly payment amount of the CBPA. As the SPD and Supplement 18 make clear, employees eligible for early retirement were entitled to receive the greater of the bargained-for early retirement benefit or "the monthly pension attributable to the CBPA determined under the otherwise applicable provisions of the Plan."

The first two sentences of subsection 7.3(b) provide that in order to calculate the monthly payment amount of the CBPA, the plan administrator should first calculate the accrued monthly benefit by multiplying the employee's CBPA by the applicable conversion factor in Table 6.6 of the plan (which converts the Cash Balance Plan Account to Annual Annuity at age 65 or later); and then multiply that amount (the accrued monthly CBPA benefit at Normal Retirement Age) by the appropriate early commencement reduction factor found in Table 6.7 in Appendix A using the Employee's age at the time of the commencement of the pension benefit.

Section 7.3(b)'s calculation effective as of January 1, 2000, however, calculates the accrued monthly benefit by (a) projecting the employee's CBPA from termination of employment to Normal Retirement Age with interest credits; (b) dividing that amount by the applicable annuity conversion factor found in Table 6.1, which is based on the employee's current age; (c) multiplying that amount by the applicable early retirement reduction factor found in Table 6.7 of the SNET Pension Plan, using the employee's age at the time of commencement of the benefit.[9]

Finally, Section 7.3 incorporates the terms of the MOU, as discussed above, which the SBC/SNET Committee construed as requiring the employee's cash balance account to be converted into a monthly benefit by dividing the balance by the age 65 conversion factor of 119.04.

Thus, under the otherwise applicable provisions of the plan, employees who commence receipt of their retirement benefits prior to reaching age 65 would have their accrued benefit discounted by an early commencement factor. Such a result would be consistent with ERISA, which provides that early retirement benefits must be "not less than the benefit to which he would have been entitled at the normal retirement age, actuarially reduced under regulations prescribed by the Secretary of the Treasury." 29 U.S.C. § 1056. SBC/SNET notes, and plaintiffs do not dispute, that the result of its calculation is always greater than the amount the employees would be entitled to under the otherwise applicable provisions of Section 7.3(b). Because this amount exceeds the minimum required by ERISA, the Committee's construction complies with federal law.

### b. Lump Sum Benefits

SBC/SNET determined that the early retirement provision applied only to the

---

9. This calculation is consistent with the "accrued benefit" definition in Section 5.2 of the plan, which defines an accrued benefit as a benefit *commencing* at normal retirement age. Section 5.2 requires projecting forward with interest credits to age 65, and multiplying that amount by the appropriate age 65 annuity factor (steps (a) and (b) above).

If the employee commenced his retirement at age 65, the annuity conversion factor under Table 6.1 would be 9.92, or, expressed in monthly terms, 119.04 (9.92 × 12), and, applying step (c), there would be no reduction for early commencement (as the appropriate factor in Table 6.7 is 1.00000).

annuity form of payment, not other forms such as lump sums. Plaintiffs acknowledge that the SNET Plan and the SPD provide that the early retirement benefit applies only to the annuity form of payment, as the MOU was incorporated into Section 7.3(b) of the Plan, which clearly sets forth the "Amount if Payable as a Single life Annuity," and the SPD likewise describes the MOU provision as an "Enhanced CBPA Annuity." Plaintiffs argue, however, that the MOU should be interpreted as allowing unreduced early retirement benefits as a lump sum. In plaintiffs' view, in order to give effect to the early retirement provision and provide unreduced early retirement benefits, the lump sum calculation should project the CBPA balance forward with interest credits to age 65 but should not discount back to present value. Plaintiffs look to paragraph 5 of the MOU, which provides that the lump sum must be "[t]he employee's CBP account balance" if that is higher than the other possible calculations of the lump sum. Plaintiffs read paragraph 5 in conjunction with paragraph 3 of the MOU (which sets forth the early retirement benefit), and argue that the CBP account balance should be calculated "as though the participant was age 65" by projecting interest credits forward, and that there is no need to reduce that value back to present value because that would "undo the benefits granted in paragraph 3." Plaintiffs' Mem. at 4. This interpretation must fail, for several reasons. First, the early retirement benefit expressed in paragraph 3 of the MOU expressly applies to the "monthly pension attributable to the CBP account," not to the amount of the CBP account itself. Thus, the inclusion of this provision in the plan documents to benefits taken in the annuity form of payment is reasonable, particularly given paragraph 3's inclusion of the sentence beginning "[i]f employee is under age 65 and elects distri-

bution of the CBP benefit as a single life annuity . . . .," which, as discussed above, is reasonably viewed as an expression of *how* to carry out the general intent of the preceding enhanced early retirement benefit provision. Moreover, receipt of a lump sum payment that projected interest credits forward to age 65, but did not discount back to present value would give plaintiffs *more* than what they could expect from the annuity, which is nowhere provided for in the MOU or in any of the plan documents.

■ Plaintiffs also argue that the plan language violates ERISA "by forcing employees to choose between an unreduced early retirement annuity and the only other option SNET says is available, the less valuable current balance of their cash balance accounts." Pl. Mem. at 10. The SNET Plan provides:

> The lump sum distribution of an Employee's CBPA as of the commencement date shall be the greater of (i) the Employee's CBPA; and (ii) the present value of the Employee's accrued benefit as described in 5.2 . . . . For any Employee who terminates employment on or after October 21, 1997, the present value of the Employee's accrued benefit calculated pursuant to this paragraph (ii) shall be the present value of the annuity calculated as of the Normal Retirement Age (or current age, if later) using the Applicable Interest Rate and the Applicable Mortality Table.

SNET Plan, ¶ 7.3(e).

Pursuant to this provision, SBC/SNET calculates the lump sum by (1) projecting the CBPA with interest credits to age 65; (2) converting the resulting amount into a monthly single life annuity at age 65 (by dividing the CBPA plus interest by 119.04, the age 65 annuity factor); and (3) converting that resulting amount into a lump sum value at the benefit commencement

date using the present value factors set forth in Internal revenue Code 417(e)(3). This so-called "whip-saw" calculation is required under ERISA, because, as the Second Circuit explained in *Esden v. Bank of Boston*, 229 F.3d 154 (2d Cir.2000):

> [T]he rules governing distributions from defined benefit plans are framed in terms of the normal retirement benefit—typically, a single-life annuity payable at normal retirement age. Any distribution in optional form (such as a lump sum) must be no less than the actuarial equivalent of such benefit. For a cash balance plan this calculation involves projecting the cash balance forward and then discounting back to present value. The projection rates may be defined by the plan; but the discount rate is prescribed by statute. If the plan's projection rate exceeds the statutory discount rate, then the present value of the accrued benefit will exceed the participant's account balance. Unless this higher figure is paid out, the IRS takes the view that an impermissible forfeiture has occurred in violation of ERISA § 203(a) and I.R.C. § 411(a)(2).

*Id.* at 159 (citing Notice 96–8, 1996–1 C.B. 359–61).

Because the lump sum payment under the SBC/SNET plan will never be less than the amount resulting from the "whip-saw" calculation, it complies with ERISA. While the resulting lump-sum amount for an employee retiring early may be less than the comparable annuity benefit enhanced under the provisions of the Plan, there is nothing in ERISA or in the Internal Revenue Code that prohibits such a discrepancy.

ERISA § 204(c)(3), or 29 U.S.C. § 1054(c)(3), provides:

> [I]n the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, or if the accrued benefit derived from contributions made by an employee is to be determined with respect to a benefit other than an annual benefit if the form of a single life annuity (without ancillary benefits) commencing at normal retirement age, the employee's accrued benefit, or the accrued benefits derived from contributions made by an employee, as the case may be, shall be the actuarial equivalent of such benefit or amount determined under paragraph (1) or (2).

■ The term "accrued benefit," in turn, is defined as "the individual's accrued benefit determined under the plan and except as provided in section 204(c)(3), expressed in the form of an annual benefit commencing at normal retirement age." ERISA § 3(23)(A). As the Second Circuit in *Esden* clarified: "What these provisions mean in less technical language is that: (1) the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at normal retirement age; and (2) if the benefit is paid at any other time (e.g., on termination rather than retirement) or in any other form (e.g., a lump sum distribution, instead of annuity) it must be worth at least as much as that annuity." *Esden*, 229 F.3d at 163. Accordingly, this Court agrees with defendants' position that the lump sum benefit must be the equivalent of the normal retirement benefit, that is, the accrued benefit expressed as an annuity beginning at normal retirement age, but need not be the equivalent of the enhanced early retirement annuity.[10]

---

10. SBC/SNET's interpretation is also consistent with the applicable IRS regulations. IRS Notice 96–8 provides that "in order to comply with sections 411(a) and 417(e) [of the Inter-

Plaintiffs argue that the logic that employees need not receive a lump sum benefit equal to the subsidized early retirement annuity is flawed because "[i]t ignores that Section 204(c)(3) says that employees must get lump sum benefits that are equal in value to their annuities when their accrued benefits are '*determined as* an ... annual benefit commencing at normal retirement age' not that they must get lump sum benefits that are equal in value to their annuities only when their accrued benefits are '*taken as* an annual benefit commencing at normal retirement age.'" Pl. Mem. at 43. The Court disagrees. The operative phrase in Section 204(c)(3) is that the employee's benefit "shall be the actuarial equivalent of *such benefit*." (emphasis added). "Such benefit" in this paragraph refers to the "annual benefit commencing at normal retirement age," not to any alternative benefit offered under the plan.

Plaintiffs also argue that defendants misconstrue the meaning of an "accrued benefit" under ERISA. ERISA defines an accrued benefit as "the individual's accrued benefit under the plan ... *expressed in the form of* an annual benefit commencing at normal retirement age." (emphasis added) According to plaintiffs, this definition does not provide that the accrued benefit "*is*" an annual benefit commencing at normal retirement age. While the use of the phrase "expressed in the form of"

acknowledges that the accrued benefit may take forms other than an annuity commencing at normal retirement age, it does not require that the other forms be anything other than equal to the value of the "annuity commencing at normal retirement age."

In addition, plaintiffs rely on *Amato v. Western Union International, Inc.*, 773 F.2d 1402 (2d Cir.1985), in which the Second Circuit concluded that a plan amendment "eliminating plaintiffs' unreduced early retirement benefits appears to violate ERISA § 204(g) and I.R.C. § 411(d)(6), which prohibit a decrease in a participant's 'accrued benefit.'" *Id.* at 1414. In *Amato*, however, the issue was whether a plan amendment could lawfully reduce early retirement benefits that employees had theretofore been eligible to receive. The Second Circuit thus did not consider the issue in this case, and offered no opinion on whether subsidized early retirement benefits may be offered in annuity form but not offered as a lump sum payment.[11]

■ This Court is further persuaded that ERISA plans are permitted to subsidize early retirement benefits when taken as an annuity but not when taken in other forms, because Treasury Regulations clearly authorize such an approach. For

---

nal Revenue Code] in calculating the amount of a single sum distribution under the cash balance plan, the balance of the employee's hypothetical account must be projected to normal retirement age and then the employee must be paid at least the present value, determined in accordance with section 417(e), of that projected hypothetical account balance." IRS Notice 96–8, 1996–1 C.B., 1996 WL 17901 (IRS NOT).

**11.** As explained in *Blessitt v. Retirement Plan For Employees of Dixie Engine Co.*, 848 F.2d 1164, 1174 (11th Cir.1988), the issue in *Amato,* "i.e. whether a plan amendment can elimi-

nate an early retirement benefit for which employees had not yet fully qualified at the time of the amendment—was addressed by the 1984 amendments to § 411(d)(6) of the Internal Revenue Code and § 204(g) of ERISA, 29 U.S.C. § 1054(g). Under these sections as amended, a plan amendment cannot eliminate a retirement-type subsidy 'with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy.'" *Id.* at 1174 (quoting 26 U.S.C. § 411(d)(6)(B); 29 U.S.C. § 1054(g)(2)).

example, Treas. Reg. § 1.411(a)–11(a)(2) provides:

> Accrued benefit. For purposes of this section, an accrued benefit is valued taking into consideration the particular optional form in which the benefit is to be distributed. The value of an accrued benefit is the present value of the benefit in the distribution form determined under the plan. For example, a plan that provides a subsidized early retirement annuity benefit may specify that the optional single sum distribution form of benefit available at early retirement age is the present value of the subsidized early retirement annuity benefit. In this case, the subsidized early retirement annuity benefit must be used to apply the valuation requirements of this section and the resulting amount of the single sum distribution. However, if a plan that provides a subsidized early retirement annuity benefit specifies that the single sum distribution benefit available at early retirement age is the present value of the normal retirement annuity benefit, then the normal retirement annuity benefit is used to apply the valuation requirements of this section and the resulting amount of the single sum distribution available at early retirement age.

*See also* T.D. 8219, 53 Fed.Reg. 31837 (1988), preamble to Treas. Reg. § 1.401(a)–11 ("A plan may have more than one optional form of benefit under which benefits may be paid. There is no requirement that each form of benefit be the actuarial equivalent of all other benefit forms ... [A] plan may provide for a retirement subsidy or an early retirement benefit that applies to the payment of a specific optional form. Whether these subsidies must be valued when calculating the amount of the single sum distribution depends on the plan provisions."); T.D. 9099, 68 Fed.Reg. 70141 (2003), preamble to Treas. Reg. § 1.417(a)(3)–1 ("If a plan provides a subsidy for one optional form of benefit (i.e., the payments under an optional form of benefit have an actuarial present value that is greater than the actuarial present value of the accrued benefit), there is no requirement to extend a similar subsidy (or any subsidy) to every other optional form of benefit. Thus, for example, a participant might be entitled to receive a single-sum distribution upon early retirement that does not reflect any early retirement subsidy in lieu of a QJSA that reflects a substantial early retirement subsidy.").[12]

Thus, the Treasury Regulations make clear that while a plan may choose to subsidize early retirement benefits taken in both an annuity and lump sum form, it is not required to do so, and if the subsidized early retirement benefits apply only to the annuity form, then the normal annuity retirement benefit may be used to determine the lump sum amount.

Plaintiffs seek to distinguish the IRS regulations by arguing that "subsidized"

---

12. *See also* Treas. Reg. § 1.411(d)–4 Q & A–2(a)(2)(I) (as amended in 2000):

> A plan may treat a participant as receiving his entire nonforfeitable accrued benefit under the plan if the participant receives his benefit in an optional form of benefit in an amount determined under the plan that is at least the actuarial equivalent of the employee's nonforfeitable accrued benefit payable at normal retirement age under the plan. This is true even though the partici-pant could have elected to receive an optional form of benefit with a greater actuarial value than the value of the optional form received, such as an optional form including retirement-type subsidies, and without regard to whether such other, more valuable optional form could have commenced immediately or could have become avail-.able only upon the employee's future satisfaction of specified eligibility conditions.

early retirement benefits, which are addressed by the regulations, are not the same as the "unreduced" early retirement benefits that they seek. Such parsing of language is both irrelevant, given this Court's conclusion that SBC/SNET reasonably construed the early retirement annuity benefit to provide a partially subsidized early retirement benefit, and unavailing. Defendants argue and the Court agrees that the distinction plaintiffs seek "would be illogical since it would result in different rules applying to a plan simply because of the extent of its subsidy." Treasury regulations, moreover, use the terms "unreduced" and "subsidized" interchangeably. *See* Tres. Reg. § 1.411(a)–7 ("Example (1) Plan A ... provides for a full unreduced accrued benefit without any actuarial reduction for any employee at age 55 with 30 years of service. Even though the actuarial value of the early retirement benefit could exceed the value of the benefit at the normal retirement age, the normal retirement benefit would not include the greater value of the early

retirement benefit because actual subsidies are ignored.").

#### c. Conflict of Interest

■ The Second Circuit instructs that courts must engage in a two step inquiry when a conflict of interest is alleged: first, whether the determination made by the administrator is reasonable, and second, whether the evidence demonstrates that the administrator was in fact influenced by such conflict. *Sullivan v. LTV Aerospace & Def. Co.*, 82 F.3d 1251, 1255–56 (2d Cir.1996). For the reasons discussed above, the Court concludes that the SBC/SNET plan administrator's determination was reasonable and supported by existing law. The evidence before the administrative committee demonstrating the intent of the bargaining parties in reaching the MOU also supports the administrator's conclusion.[13]

■ Plaintiffs' evidence that the administrators were in fact influenced by a conflict rests on the undisputed fact that the Committee members were employed by SBC subsidiaries.[14] Plaintiffs thus ar-

---

13. For example, the Committee had before it the "Final bargaining report" provided by the union to its members after reaching its agreement on early retirement benefits, which explained the pension agreement as follows:

 The Cash Balance Plan monthly annuity pension benefit amount will be increased for any regular bargained-for employee who:
 A. Has completed 30 or more years of Benefits NCS, or
 B. Is age 55 or older with 20 or more years of Benefits NCS, and
 C. Is under age 65 when the pension benefit is payable.
 The amount of the monthly annuity pension benefit will be determined by dividing the Cash Balance Plan lump sum account balance by the age 65 conversion factor of 119.04 (Instead of the conversion factor based on the employee's actual age which would result in a lower monthly pension benefit.)

*See* Final Bargaining Report, included in Administrative Record of the SBC Benefit Plan Committee [Doc. # 75, Ex. B] at SBC 1654–55.

Although plaintiffs argue that the "Final Bargaining report did not tell employees what Cash Balance Plan lump sum would be divided by 119.04—the one that would exist at age 65, or the one that reflected a reduction from age 65 based on the employee's actual age at retirement," the Bargaining report does not evidence an intent contrary to that which the Committee ultimately adopted.

14. Although plaintiffs initially requested further discovery on the conflict of interest issue, in their opposition brief, they state that "the employees have decided that if the evidence submitted isn't enough to show the conflicts influenced the administrative decisions at issue, the employees won't claim that more discovery would likely uncover the kind of subjective admission of guilty or 'smoking gun' document they may need to show the

gue that they had a financial stake in the matter at hand. Defendants assert, however, that the Committee had no financial incentive to deny SBC/SNET plaintiffs' claims because the compensation of Committee members is not tied to their benefits determinations, and the benefits are paid from a fund established for the payment of benefits, which is separate from the assets of SBC and SNET. *See* Affidavit of Duane B. Helm, Vice President–Compensation of SBC Operations, Inc., August 16, 2004 [Doc. # 75, Ex. G] at ¶ 4. Under the circumstances of this case, and in light of the reasonable foundation for the Committee's decision, plaintiffs have not demonstrated that the Committee members' employment by SBC in fact influenced their decision.

 Plaintiffs have submitted extrinsic evidence, that was not before the Committee, indicating that the employees understood that they were to receive unreduced early retirement benefits, and that the intent of union officials was to try to match the benefits achieved at Verizon and other telecommunications companies providing unreduced early retirement benefits. Plaintiffs also note that the union is divided on the intent of the bargained agreement. "The decision whether to consider evidence from outside the administrative record is within the discretion of the district court. Nonetheless, the presumption is that judicial review 'is limited to the record in front of the claims admin-

istrator unless the district court finds good cause to consider additional evidence.' " *Muller v. First Unum Life Ins. Co.,* 341 F.3d 119, 125 (2d Cir.2003) (quoting *DeFelice v. Am. Int'l Life Assurance Co. of N.Y.,* 112 F.3d 61, 66 (2d Cir.1997)). Because the Committee's decision here is subject only to an arbitrary and capricious review, and in the absence of evidence that the Committee was in fact influenced by a conflict of interest, it is inappropriate to look outside of the administrative record.[15]

## B. Cingular Plan

### 1. Standard of Review

The standard of review to be applied in reviewing the claims of the Cingular plaintiffs presents a different set of questions. While the Cingular Plan provides that "The Administrative Committee shall have sole and absolute discretion to interpret the provisions of the Plan . . . to determine the rights and status under the Plan of Participants and other persons, to decide disputes arising under the Plan and to make any determinations and findings with respect to the benefits payable thereunder," *see* Cingular Plan [Doc. # 123, Ex. 36] at § 9.7, in reviewing the claims of the Cingular plaintiffs, the Cingular Administrative Committee expressly relied only on the language of the MOU and the intent of the parties who reached that collectively bargained agreement, not on the language of the Cingular plan documents them-

employers' conflicting interests influenced their administrative decisions." Plaintiffs' Memorandum of Law Opposing Defendants' Motions for Summary Judgment [Doc. # 94] at 11.

**15.** In *DeFelice,* the Second Circuit concluded that where a *de novo* standard of review applied, "[a] demonstrated conflict of interest in the administrative reviewing body is an example of 'good cause' warranting the introduction of additional evidence." *DeFelice,* 112

F.3d at 66. The Court contrasted its "good cause" requirement for introduction of extrinsic evidence under the *de novo* review standard with requirement under the arbitrary and capricious standard that the plaintiff demonstrate that the conflict caused "actual prejudice." *See id.* ("[I]n contrast to the *Pagan* rule, the plaintiff need not demonstrate that the conflict caused her actual prejudice in order for the court to consider the conflict to be 'good cause.' ").

selves. *See* Letter from Monty Hill, Secretary, Administrative Committee, to Thomas G. Moukawsher, July 15, 2004 [Doc. # 82] at CIN 3231 (noting that "there are inconsistencies between the Plan, the SPD and the MOU. However, in resolving these inconsistencies, the Committee concluded that the clear language of the MOU reflects the language negotiated and agreed on by SBC and the CWA and, therefore the MOU must prevail."). Plaintiffs thus argue that *de novo* review is appropriate because the MOU, the collectively bargained agreement on which Cingular based its denial of benefits decision, did not reserve discretion in the administrator.

The initial—and dispositive—issue in reviewing the claims of the Cingular plaintiffs is whether the Committee properly relied on the MOU rather than the Cingular Plan and SPD. This decision is reviewed *de novo*. The MOU was reached in February 2001, prior to the creation of the Cingular Plan, and while it may have been Cingular's intention to incorporate its provisions into the Cingular Plan and SPD, the express MOU terms appear nowhere in the Cingular plan documents. The Committee concluded that the terms of the MOU were "inconsistent" with the other plan documents, and determined that to carry out the intent of the parties in collective bargaining, the plain language of the MOU controlled. Therefore, the Committee's decision was such that the Committee did not interpret the Cingular Plan.

The Committee's decision to follow the MOU and to disregard the Cingular Plan terms is not subject to any grant of discretion in the Plan, and in fact presents an intriguing legal question at the intersection of ERISA and federal labor law. As the Committee made clear, it also based its decision to adopt the MOU as the controlling plan document on its view that "any unilateral modification of the MOU by Cingular would violate federal law." Letter from Monty Hill, Secretary, Administrative Committee, to Thomas G. Moukawsher, July 15, 2004 [Doc. # 82] at CIN 3231. The interpretation of ERISA and federal labor law is the province of the courts and therefore subject to *de novo* review. *See, e.g. Burke v. Kodak Retirement Income Plan*, 336 F.3d 103, 111 (2d Cir.2003) (reviewing *de novo* the question of whether ERISA required the beneficiary to demonstrate reliance on a deficient SPD, because " 'the interpretation of ERISA, a federal statute, is a question of law subject to de novo review.' ") (quoting *Long v. Flying Tiger Line, Inc. Fixed Pension Plan for Pilots*, 994 F.2d 692, 694 (9th Cir.1993)).[16]

---

16. The Cingular SPD is silent on whether there is a reservation of discretion in the administrative committee, *see* Cingular SPD [Doc. # 123, Ex. 37], and plaintiffs also argue that *de novo* review is required because the Cingular SPD, the only plan document given to employees, did not contain a reservation of discretion. Because *de novo* review of the Cingular Committee's decision to follow the MOU as the controlling plan document is appropriate, the Court need not decide this issue. There is some authority informing when de novo review based on deficiencies in the SPD would be appropriate. For example, in *Heidgerd v. Olin Corporation*, 906 F.2d 903, (2d Cir.1990), a case in which only a summary plan document, not the plan itself, was distributed to employees, the Second Circuit concluded that where "the terms of a plan and those of a plan summary conflict, it is the plan summary that controls." *Id.* at 908. The Second Circuit reasoned, "the statute contemplates that the summary will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary. To allow the Plan to contain different terms that supercede the terms of the Booklet would defeat the purpose of providing the employees with summaries." *Id.* In *Burke v. Kodak Retirement Income Plan*, 336 F.3d 103 (2d Cir.2003), the Second Cir-

### 2. Analysis

#### a. Conflict Between MOU and Cingular Plan

██ Because the Memorandum of Understanding that sought to amend the SBC/SNET plan was a product of collective bargaining, and because Cingular's stated intent was to import into its plan this collectively bargained agreement for transferred SBC/SNET employees, Cingular argues first that this Court should strive to read all the governing plan documents, including the SNET Plan, the Cingular plan documents, and the MOU, together as a consistent whole. In *Bozetarnik v. Mahland*, 195 F.3d 77 (2d Cir. 1999), for example, the Second Circuit considered both the Plan and the collective bargaining agreement and ultimately found that the terms could be reconciled so that they did not conflict with each other. Although the Committee found and Cingular appeared to concede in its opening memorandum that the MOU cannot be reconciled with the other Cingular plan documents, in its reply brief Cingular argues that the plan provisions can be construed consistently with the MOU.

The Early Retirement Annuity Provision appears in Section 5.4(b)(3) of the Cingular Plan:

> The Termination benefit of a Transferred Employee whose Benefit Commencement Date is prior to January 1, 2005, and who has, as of such Benefit Commencement Date, either (i) attained age 55 and completed at least 20 Years of Net Credited Service or (ii) completed at least 30 Years of Net Credited Service, shall never be less than the amount determined in Section 3.1(a).

As Cingular notes, "section 3.1(a) of the Cingular Plan contains two subsections defining a participant's accrued benefit alternatively as (1) an annuity based on a projected-forward account balance if the determination is made *before* the participant's attainment of age 65; and (2) an annuity based on the stated account balance divided by 119.04 if the participant *is* age 65." Reply Memorandum in Support of the Cingular Defendants' Motion for Summary Judgment [Doc. # 110] at 14. Because the MOU requires that a participant's "account will be determined as though the participant was age 65," Cingular argues that the MOU and the Plan are reconcilable by following subsection (2) of Section 3.1(a), taking the stated account balance and dividing it by 119.04. Similarly, as to the Cingular SPD, Cingular argues that although the SPD provides for "unreduced early retirement benefits," and states "your Accrued Benefit will not be reduced for early commencement," the SPD also provides "[i]f you have already reached age 65, your Accrued Benefit is a monthly payment amount equal to your Cash Balance divided by the applicable Annuity Conversion Factor." SPD [Doc. # 82] at CIN 1316.

Cingular's post-hoc rationale is entitled to no deference, and fails on its merits. First, Cingular's approach would require ignoring the express early retirement

---

cuit was confronted with a situation in which the summary plan document was silent on whether an affidavit was required as part of an application for survivor income benefits, while the Plan itself made clear that an affidavit was required. The Court concluded, "[b]ecause the relevant section of the SPD omits the affidavit requirement, it conflicts with the Plan. Thus, the SPD controls." *Id.*

at 111. The Second Circuit, however, has not yet addressed whether silence in the SPD on an issue affecting the procedural rights rather than the substantive benefit entitlement of a plan participant, may be deemed a conflict, and this Court does not reach the issue.

It is also not necessary to reach plaintiffs' argument that *de novo* review is appropriate because Cingular decided their claims late.

terms of the Cingular Plan and SPD, which provide that an employee should first project forward her CBP account with interest credits to age 65, and then divide the resulting amount by "the product of (A) 9.92; multiplied by (B) 12," or 119.04. Moreover, the SPD, which is "an employee's primary source of information regarding employment benefits," on which they are "entitled to rely," *Burke*, 336 F.3d at 110, calls for "unreduced early benefits" and provides a clear example of how an employee should calculate benefits that projects the employee's CBP account forward with interest credits before dividing by the age 65 annuity conversion factor. Because the Cingular Plan expressly requires adding interest credits to the cash balance account before applying the age 65 conversion factor, it cannot be reconciled with the MOU's calculation provision omitting the interest credits in the manner Cingular suggests.

Cingular also argues that in adopting its pension plan when Cingular was formed in 2001, it sought "merely" to incorporate the terms of the SNET Pension Plan and MOU. The Cingular Plan's statement of purpose stated its goal to identify "benefits available to certain bargaining units in Communications Workers of America District 1. These bargaining units had bargained to participate in the SNET Plan prior to being transferred to [Cingular] or have subsequently bargained for such benefits." Cingular Plan [Doc. # 82] at CIN 1207–08. Likewise, the Cingular SPD provides that "[b]enefits described in this Summary Plan Description reflect provisions agreed to in the applicable collective bargaining agreements." Cingular SPD [Doc. # 82] at CIN 1330. Addressing the early retirement benefit provisions in the Cingular Plan and SPD, as compared to the MOU, Cingular argues that "these unilaterally drafted inconsistent Plan provisions shed no light on the proper interpre-

tation or meaning of the Early Retirement Annuity provision because Cingular (who issued them through its outside counsel) had no seat at the bargaining table when the Provision was negotiated and, therefore, had no insight as to the intent of the parties or the meaning of the language." Memorandum of Law in Support of the Motion for Summary Judgment by Defendants Cingular Wireless LLC, Cingular Wireless Bargained Pension Plan and Cingular Wireless bargained Pension Plan Trust [Doc. # 81] at 32. The question here is not, however, what is the proper interpretation of the MOU. Rather, the question is first whether the apparently inconsistent provisions of all the plan documents, when viewed collectively, can be reconciled, and if not, which documents should control vis-a-vis the plaintiffs.

For the reasons discussed above, the Court concludes that the MOU cannot be reconciled with the Cingular Plan or with the SPD in the manner Cingular seeks. There are therefore two remaining options: to conclude that the MOU is reconcilable with the Cingular Plan and SPD in plaintiffs' favor (by inferring that the ambiguity in the MOU simply led the drafters of the Cingular Plan to a different interpretation of their obligations under the MOU than SBC/SNET), or to conclude the MOU cannot be reconciled with the Cingular Plan. It is not necessary to decide this issue, because regardless of whether the MOU and plan terms are read as a consistent whole in the manner plaintiffs seek, whether the MOU is found to conflict with the Cingular Plan and SPD terms, or whether the meaning of the three relevant documents is impenetrable, plaintiffs are entitled to unreduced early retirement benefits. Under ERISA, it is well established that "[w]here the terms of a plan and the SPD conflict, the SPD controls." *Burke*, 336

F.3d at 110; *Heidgerd,* 906 F.2d at 908. As the Second Circuit explained, "the statute contemplates that the summary will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary." *Heidgerd,* 906 F.2d at 908. Thus, assuming a conflict, the terms of the SPD, which clearly explain the manner in which early retirement benefits are to be calculated, must be given priority. Even if the intent of the Cingular Plan drafters is not ascertainable, any ambiguity in an ERISA plan reviewed *de novo* is construed in favor of the plan beneficiary, which would also require the provision of unreduced early retirement benefits. *See Masella v. Blue Cross and Blue Shield,* 936 F.2d 98, 107 (2d Cir.1991).

■ It is at this point, however, that the requirements of ERISA create for the Cingular Plan a potential conflict with federal labor law. Cingular assumed the obligations of the collectively bargained MOU, and therefore was "bound to abide by the terms of that contract." *NLRB v. Babad,* 785 F.2d 46, 50 (2d Cir.1986). There is ample authority for the proposition that benefits subject to collective bargaining may not be modified unilaterally by the employer. *See, e.g. NLRB v. Katz,* 369 U.S. 736, 742–45, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) (holding that "an employer's unilateral change in conditions of employment under negotiation is similarly a violation of [the National Labor Relations Act], for it is a circumvention of the duty to negotiate which frustrates the objectives of [the Act] much as does a flat refusal."); *see also Litton Fin. Printing Div. v. NLRB,* 501 U.S. 190, 198, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991) ("Sections 8(a)(5) and 8(d) of the NLRA, 29 U.S.C. §§ 158(a)(5) and (d), require an employer to bargain 'in good faith with respect to

wages, hours, and other terms and conditions of employment.' The Board has taken the position that it is difficult to bargain if, during negotiations, an employer is free to alter the very terms and conditions that are the subject of those negotiations. The Board has determined, with our acceptance, that an employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment."). As the Second Circuit has explained:

> Unilateral action by an employer concerning subjects of mandatory bargaining is a violation of the duty to bargain in good faith, in the absence of a true impasse in negotiations. Such unilateral action by an employer is disfavored because it detracts from the legitimacy of the collective bargaining process by impairing the union's ability to function effectively, and by giving the impression to members that a union is powerless. Thus, even unilateral increases in wages and benefits are prohibited in the absence of an actual impasse.

*Carpenter Sprinkler Corp. v. NLRB,* 605 F.2d 60, 64–65 (2d Cir.1979) (citations omitted).

At oral argument, Cingular's counsel noted that ERISA specifically provides that nothing in it "shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections 1031 and 1137(c) of this title) or any rule or regulation issued under any such law." 29 U.S.C. § 1144(d). Under this provision, Cingular argues, ERISA yields to federal labor laws.

■ Plaintiffs distinguish the authority on which Cingular relies, noting that "they are all cases where companies have abandoned collective bargaining and unilaterally adopted benefits changes; they are not

cases where a court has interpreted workers' employee benefit rights under ERISA." Plaintiffs' Memorandum of Law Opposing Defendants' Motions for Summary Judgment [Doc. # 94] at 16. Plaintiffs argue that this Court should strive to give effect to both the NLRB and ERISA, and urges that the enforcement of the core ERISA duty that an employer has to write a clear summary plan description on which employees may rely would not undermine a union or a company's ability to bargain. *See, e.g. Wayne v. Pacific Bell*, 238 F.3d 1048, 1055 (9th Cir.2001) ("An employer attempting to undermine a union's power to bargain on behalf of its members is a far cry from communicating as a fiduciary about serious consideration of a proposal to change employee ·benefits under an ERISA plan.").

The Cingular plaintiffs' argument is persuasive. First, because the changes in the Cingular Plan were not made in the context of an ongoing bargaining situation, they cannot be said to undermine the union's power to bargain, distinguishing this case from *Katz*, *Litton*, and *Carpenter Sprinkler.*

Second, as discussed above, the early retirement benefits provisions in the Cingular Plan and SPD need not be viewed as unilateral changes in the collectively bargained agreement, or as an abrogation of the duty they assumed. Given the ambiguity in the MOU's stated intention to determine the monthly pension attributable to the CBP account "as though the participant was age 65," the drafters of the Cingular Plan may adopt a different interpretation than SBC/SNET of their obligations under the MOU.

Moreover, even assuming that the Cingular Plan and SPD did unilaterally change the collectively bargained agreement, construing ERISA to require payment of the·benefits offered in the Cingu-

lar Plan and SPD would not invalidate the applicable federal labor law. The issue here is not whether Cingular lawfully may unilaterally change terms and conditions of employment that are the subject of collective bargaining, rather it is whether having unilaterally changed such conditions, an employee is entitled to rely on them. Any labor law violation, even if inadvertent, occurred at·the time the Cingular Plan was drafted, and plaintiffs here seek to enforce their rights under ERISA, not to challenge the terms of the Plan. Because ERISA requires that where benefits provisions in various plan documents conflict, the summary plan provisions must prevail, the Court concludes that the Committee improperly relied on the MOU.

Cingular argues that the retired Cingular plaintiffs never raised their argument that the Cingular Plan controls in the administrative process and the employee Cingular plaintiffs raised it only in the final step of their administrative appeal. Throughout the administrative process, however, the Cingular plan administrator and the Committee on appeal also focused on the MOU, not the terms of the Cingular Plan. It is this decision that is the subject of review. Plaintiffs properly exhausted their claim for benefits under the plan, and they need not raise every legal theory on which they base their claim for benefits in order to exhaust.

In *Burke,* the Second Circuit concluded that where the SPD conflicts with the Plan, a plan participant or beneficiary must show that s/he "was *likely* to have been harmed as a result of a deficient SPD. Where a participant makes this initial showing, however, the employer may rebut it through evidence that the deficient SPD was in effect a harmless error." *Burke,* 336 F.3d at 113 (emphasis in original). The *Burke* Court reasoned, "[t]he consequences of an inaccurate SPD must

be placed on the employer. The individual employee is powerless to affect the drafting and less equipped to absorb the financial hardship of the employer's errors." *Id.* Cingular has not argued that the fact that plaintiffs did not invoke the terms of the Cingular Plan or SPD earlier in the administrative process would be relevant to the question of whether they were prejudiced by the inconsistencies between the MOU and the Cingular plan. Because the retired Cingular plaintiffs received benefits estimates from Cingular's actuaries and made their initial decision to retire based on these estimates; because the current Cingular employees were aware of the conflicting estimates given to the retirees as well as the problems faced by the 2001 SNET retirees; and because the differences in application of Cingular's interpretation and plaintiffs' are so significant, with plaintiffs facing a significant reduction in their anticipated benefits under Cingular's view of the MOU, plaintiffs' showing of prejudice is clear, and Cingular has not rebutted this showing.[17]

### b. Availability of Unreduced Lump Sum Payments under the Cingular Plan

Cingular's actuary provided lump sum estimates to the 2002 Cingular retirees that did not reduce the projected account balance back to present value. The parties have not addressed the lump sum estimate under the Cingular Plan itself, rather than the MOU. Section 6.2 of the Cingular Plan provides for "Election of Alternative Payment Forms" as follows:

(a) Election. After receiving the retirement notice described in Section 6.3, a Participant who is eligible for an annuity form of benefit under Section 6.1 may make a Qualified Retirement Election at any time within the 90–day period ending on his Benefit Commencement Date to have his benefits paid in one of the alternative benefit payment forms described in subsection (b) hereof.

(b) Optional Payment Forms. The alternative benefit forms from which a Participant may elect pursuant to the terms of this Section shall be equivalent to the amount of the Participant's vested Accrued Benefit as follows:

(1) Life Annuity. A monthly retirement benefit payable during the Participant's lifetime, with payments to cease after the payment due on the first day of the month in which the Participant's death occurs;

(2) Single–Sum Payment. A single-sum payment equal to the greatest of (A), (B), (C), or (D) as follows:

(A) the Actuarial Equivalent of the Participant's Accrued Benefit

(B) the Actuarial Equivalent of the single life annuity the Participant would be entitled to receive pursuant to subsection (B)(1) hereof commencing on his Benefit Commencement Date;

(C) the Participant's Cash Balance Account;

(D) with regard to a Transferred Employee, the sum of (1) the Actuarial Equivalent of such Transferred Employee's frozen Core Pension Benefit, plus (ii) such Transferred Employee's

---

17. Although Cingular offered to allow the retired Cingular plaintiffs to return to work, reemployment is not an equivalent to receiving a pension during a period of early retirement, and is therefore not a remedy for not getting what the Plan and SPD promised.

Frozen Enhanced Cash Balance Account; or

(E) with regard to a Transferred Employee who terminates employment with all Affiliates prior to January 1, 2005, the sum of (I) the Benefit, determined using the Transferred Employee's age of July 2001, and using 5.78% as the Applicable Interest Rate, plus (ii) such Transferred Employee's Frozen Enhancement Cash Balance Account.

The Cingular SPD provides:

**Optional Payment Forms**

If you elect to waive the automatic payment form (with consent of your spouse, if necessary), you may select one of the following optional forms of benefits:

- **Single Life Annuity** ... under a Single Life Annuity you will be paid the full amount of your Accrued Benefit for life. No payments will be made after your death.

- **Lump Sum** ... if you elect to have your Accrued Benefit paid in a lump sum, you will receive a single cash payment equal to the greater of (1) the present value of your Accrued Benefit; or (2) your Cash Balance Account. The present value is calculated using the interest rate on 30–year treasury bonds in effect during the middle month of the previous quarter. For example, the applicable interest rate for April through June of 2002 is the 30–year Treasury rate in effect for February 2002.

Cingular SPD [Doc. # , Ex. 37] at CIN 1319.

Because Cingular requires the lump sum payment to be the actuarial equivalent of the "Accrued Benefit," which is defined in the Cingular plan to include the interest credits to age 65, and because the Cingular SPD makes clear that "your Accrued Benefit will not be reduced for early commencement at any age," the Court concludes that the Cingular Plan, unlike the SBC/SNET Plan, extends the early retirement subsidy to lump sum payments.

## III. Conclusion

For the foregoing reasons, plaintiffs' Motion for Partial Summary Judgment [Doc. # 77] is GRANTED in part, as to the Cingular defendants, and DENIED as to the SBC/SNET defendants. SBC/SNET's Motion for Judgment on the Pleadings or in the Alternative for Summary Judgment [Doc. # 73] is GRANTED. Cingular's Motion for Summary Judgment [Doc. # 80] is DENIED. Plaintiffs have not moved for summary judgment as to Counts Five and Six of their complaint, which claim that the companies have underfunded their pension trusts. Accordingly, these claims remain in suit as to the Cingular defendants. All claims against the SBC/SNET defendants are dismissed.

IT IS SO ORDERED.